UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Crim. No. 05-cr-10004 PBS |
| | ) |
| OLEKSIY SHARAPKA | ) **FILED UNDER SEAL** |
| Defendant. | ) |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S SEALED MOTION TO DISMISS THE SUPERSEDING INDICTMENT

Defendant OLEKSIY SHARAPKA has moved this Honorable Court to dismiss the Superseding Indictment pending against him in this case. Defendant submitted a written motion to the Court citing two grounds for the dismissal: 1) Defendant understood, based on an alleged conversation with his then attorney George Gormley, that the Government had agreed not to file a superseding indictment if the defendant agreed to proffer; and 2) that the aggravated identity theft charges in Superseding Indictment, violations of 18 U.S.C. § 1028A, are invalid because the course of conduct that led to the possession and use of the stolen identity information began before the statute was enacted. The Court rejected both of these claims orally, noting that the alleged oral representation is legally invalid (even assuming that it occurred) because the written proffer agreement contains an integration clause, and that 18 U.S.C. §1028A applies because conduct in violation of the statute occurred after the statute's effective date, regardless of the fact that some other related conduct may have also occurred before the effective date of the statute. Because both of these arguments were previously rejected by the Court, they are not addressed further in this memorandum.

Though it is not mentioned in defendant's written motion, during the course of orally

1

arguing the motion, defendant also stated a third ground for dismissal of the Superseding

Indictment. This unwritten, third claim amounts to a generalized, unsupported allegation that the

Government made derivative use of some (unidentified) information obtained as a result of the

proffer agreement to secure the Superseding Indictment. The defendant has refused to provide

any detail as to what evidence obtained directly or indirectly as a result of the proffer agreement

he alleges the Government used improperly.

Defendant's claim is barred by the proffer agreement, in which the Government

specifically reserved the right to make derivative use of any information obtained during the

proffer against the defendant and the defendant specifically waived any right to a hearing on this

issue. Moreover, even had the defendant not waived the right to the hearing he now requests,

there is no factual basis for his claim. As described in more detail below, nothing the defendant

said pursuant to the proffer agreement was presented to the Grand Jury, nor did the Government

use any of the information provided by the defendant to obtain any information presented to the

Grand Jury.

I.      The Proffer Agreement Specifically Excluded the Claim the Defendant Now Asserts

The Proffer Agreement signed by the defendant, a copy of which is attached to this

motion as Exhibit 1, specifically excluded the claim he now asserts. Paragraph two of the proffer

agreement states as follows:

> The government may make derivative use of, or may pursue any investigative leads
> suggested by, any statements made or other information provided by Sharapka in the
> course of the proffer. **Any evidence directly or indirectly derived from the proffer**
> **may be used against him and others in any criminal case or other proceeding.** This
> provision is necessary in order to eliminate the possibility of a hearing at which the
> government would have to prove that the evidence it would introduce is not tainted by
> any statements made or other information provided during the proffer. See Kastigar v.

2

United States, 406 U.S. 441 (1972).  (Emphasis added).

As the bolded language above makes clear, the government specifically reserved the right to

make derivative use of any information provided pursuant to the proffer agreement against the

defendant.  By signing this agreement, the defendant specifically "eliminate[d] the possibility" of

a Kastigar hearing.  Nevertheless, defendant now seeks just such a hearing.

This provision has been a standard paragraph in US Attorney proffer agreements in this

District and others for well over 15 years.  See, e.g., United States v. Nemetz, 1987 WL 17543

(D. Mass 1987) (unpublished opinion) (quoting a District of Massachusetts proffer agreement

signed in the mid-1980's containing substantially the same provision); United States v. Threw,

861 F2d 1046 (7th Cir. 1988) (quoting a Central District of Illinois proffer agreement signed in

the mid-1980's containing substantially the same provision).

Proffer agreements are contracts describing the scope of immunity between the

Government and an individual who is providing information to the Government.  As the

Supreme Court has noted, prosecutors may condition cooperation discussions on proffer

agreements that requires the defendant to waive certain key rights.  United States v. Mezzanatto,

513 U.S. 196 (1995).  The Supreme Court noted the importance of allowing prosecutors broad

discretion in defining the terms of proffer immunity:

> Prosecutors may be especially reluctant to negotiate without a waiver agreement during
> the early states of a criminal investigation, when prosecutors are searching for leads and
> suspects may be willing to offer information in exchange for some form of immunity or
> leniency in sentencing.... Because prosecutors have limited resources and must be able to
> answer sensitive questions about the credibility of the testimony they receive before
> entering into any sort of cooperation agreement, prosecutors may condition cooperation
> discussions on an agreement that the testimony provided may be used for impeachment
> purpose.

3

Id at 205, internal quotations and citations omitted.

In Mezzanatto, the Supreme Court addressed the use of defendant's statement during a proffer in subsequent cross-examination of the defendant. However, the logic of Mezzanatto applies even more strongly to the issue before the Court in this case. If derivative use of defendants' statements were not allowed, and if defendants were routinely allowed to seek Kastigar hearings after proffer agreements, defendants in every case would simply assert that statements in the proffer were used (or might be used) in the upcoming trial, and then force the Government to attempt to prove that this information was known to the Government before the proffer. In other words, by merely reiterating information already known to the Government under the guise of giving a proffer, a defendant would create the presumption that the Government's evidence was tainted. Under those conditions, prosecutors would be very reluctant to enter into proffer agreements at all.

Courts have found that provision in a proffer agreement allowing the Government to make derivative use of the defendant's proffered statements are binding on defendants. For example, the Fourth Circuit, in an unpublished opinion, found a defendant bound by a Kastigar waiver virtually identical to the one at issue in the instance case:

> [Defendant's] statements were not used against him as direct evidence. The proffer agreement gave the Government the right to use that statement derivatively. As the Government was permitted to use the statements derivatively and the Government did not violate the proffer agreement or any evidentiary privileges, no Kastigar hearing was required because it was not necessary to determine if the Government could the use the statements derivatively.

United States v. Breeden, 149 Fed.Appx. 197, 204 (4th Cir. 2005) (unpublished opinion).

Similarly, in United States v. Heatley, 39 F.Supp.2d 287 (S.D.N.Y. 1998), Judge

4

Sotomayor found that a defendant was not entitled to a Kastigar hearing to determine if the

Government made derivative use of proffer statements to obtain a superseding indictment against

him because the proffer agreement, like the agreement in the instant case, specifically allowed

the Government to use the statements in this way. This necessarily precluded a claim that the

Government had made improper derivative use of the proffered information.

The Eight Circuit considered a related issue, and also rejected a claim that a Kastigar

hearing was required notwithstanding specific language in a plea agreement allowing the

Government to use information obtained during the proffer against the defendant in United States

v. Ziesman, 409 F.3d 941 (8th Cir. 2005). In Ziesman, the court found that it was proper for the

Grand Jury to consider testimony given by a defendant pursuant to a proffer agreement in

considering a superseding indictment charging that defendant with related events that occurred

after the date the proffer agreement was signed because the proffer agreement stated that the

defendant's statements could be used against him for crimes occurring after the date of the

agreement. The Court held that even though these statements were used directly against the

defendant (his actual testimony was relied on by the Grand Jury) no violation occurred because

the scope of the immunity had been limited by the terms of the proffer agreement:

> Ziesman contends that the Government should have been required to prove [pursuant to
> Kastigar] that all its evidence against him was derived from legitimate independent
> sources, rather than from his cooperation pursuant to the proffer agreement. However,
> the instant case is removed from the rule of Kastigar by the specific language of the
> proffer agreement.

Id at 949, Footnote 1.

Because the proffer agreement in this case clearly states that the Government is allowed

to make derivative use of the information obtained in the proffer, and because the defendant

5

specifically waived any right he might have had to a <u>Katigar</u> hearing, defendant's motion should be denied regardless of the source of the information presented to the Grand Jury.

II.    <u>The Defendant Did Not Provide Any Information in the Proffer Relevant to the Superseding Indictment that Was Presented to the Grand Jury or Used to Find Information Presented to the Grand Jury</u>:

SHARAPKA talked to the Government pursuant to the proffer agreement on three separate occasions, January 31, 2005, February 14, 2005, and May 26, 2005. The content of each of these proffers was recorded by FBI Special Agent Christopher Geary in three reports, which are attached to this memorandum as Exhibits 2-4 respectively. None of the information contained in any of these proffers was presented to the Grand Jury, nor was any information in the proffers used to obtain information presented to the Grand Jury. In fact, each of these proffers related to matters that were either unrelated to the Superseding Indictment or were already known to the Government, as discussed in more detail below.

A.    <u>January 31, 2005 Proffer Session, Exhibit 2</u>:

Special Agent Geary prepared a six page report, attached as Exhibit 2, recording the content of defendant's proffer on January 31, 2005. The first four paragraphs on page one of the report consists entirely of background information about the proffer and about the defendant. Nothing in any of these paragraphs, other than the defendant's address (which was the site of his arrest), is even remotely relevant to the Superseding Indictment, nor was it referenced during the Grand Jury testimony that led to the Superseding Indictment. The final paragraph on page one discusses SHARAPKA's move to Atlanta, and the beginning of his criminal conduct there. These events predate the Superseding Indictment and are not relevant to it.

Pages two, three, and the first half of page four deal with SHARAPKA's illegal activity

6

in Atlanta, and the activities of other individuals in various locations. None of this information is related to any count in the Superseding Indictment, and it was not referred to before the Grand Jury. The second half of page four records SHARAPKA's statements about his flight from Atlanta to Boston and his activities in Boston. This constituted no more than SHARAPKA's retelling of the information he provided to the Boston Police Department and FBI in his confessions made shortly after his arrest (and months prior to his entering into proffer agreement). Documents recording the defendant's statements in November 2004 to the Boston Police Department and the FBI are attached as Exhibits 5 and 6, respectively.

On page five, SHARAPKA describes the activities of several co-conspirators, and others involved in Internet fraud. The only information contained on page five that is relevant to the Superseding Indictment is Sharapka's statement in paragraph four that he used the aliases Alex Yannos (sic), Andrew Schamkoff and/or Andrew Schankoff to receive merchandise. However, SHARAPKA made the same admission to the FBI when it interviewed him after he waived his Miranda rights on November 7, 2004, two month before the proffer agreement. See Exhibit 6, Page 1, Paragraph 3 and Page 3, Paragraph 2.

The remainder of page five and all of page six relate to the alleged activities of other individuals, and are not relevant to the Superseding Indictment. This information was not told to Grand Jury.

B.    February 14, 2005 Proffer Session, Exhibit 3:

The entire four pages of the February 14, 2005 proffer consists of SHARAPKA's discussions of the activities of other individuals who are not named or referenced in the Superseding Indictment and were not referred to in the Grand Jury testimony that led to the

7

Superseding Indictment. The only information even remotely related to the Superseding Indictment contained in the second proffer is SHARAPKA's reference to the 59 white plastic cards with magnetic strips on the back. These white plastic cards were recovered as a result of the search of SHARAPKA's apartment on November 5, 2004. SHARAPKA referred to them in his statement to the FBI on November 7, 2004. See Exhibit 6, Page 4, Paragraph 3. Moreover, the Government had obtained a search warrant to determine what numbers were encoded on the back of these cards on November 15, 2004. See Exhibit 7.[1] In other words, the existence of the cards, the use that SHARAPKA had made of them, and the information encoded on them was known to the Government months before the proffer agreement was signed.

C.    May 26, 2005 Proffer Session, Exhibit 4:

The entire three pages of the May 26, 2005 proffer consists of SHARAPKA's discussions of the activities of other individuals who are not named or referenced in the Superseding Indictment, and were not referred to in the Grand Jury testimony that led to the Superseding Indictment. The only information even remotely related to the Superseding Indictment or the information presented to the Grand Jury contained in the third proffer is SHARAPKA's reference on the fourth paragraph of page one to HEATH LNU, a person he used as a runner in Boston. Heath LNU, whose full name is Heath Kennedy, is the runner who was arrested on November 5,

---

[1] During the proffers, SHARAPKA also referred to various information found on his computer. None of the information he discussed is relevant to the Superseding Indictment. Nevertheless, it is worth noting that SHARAPKA's computer was obtained by the Government on November 5, 2004, the date of his arrest. The Government had obtained a search warrant to search the computer on November 15, 2004, and the computer had already been searched prior to the date of the proffer agreement. See Exhibit 7.

8

2004. He is the person who led the police to SHARAPKA. See Exhibit 5.[2]

IV.    Grand Jury Testimony

One witness, FBI Special Agent Christopher Geary, testified in front of the Grand Jury

before the Grand Jury handed down the Superseding Indictment. The transcript of this testimony

is attached as Exhibit 8. Though SHARAPKA has been provided with a copy of this Grand Jury

testimony as well as the reports from the proffer, he has not pointed to a single statement made

by Agent Geary in the Grand Jury that breached the proffer agreement. The reason for this

omission is simple – Agent Geary's testimony did not include any discussion of information

obtained as a result of the proffer agreement, and did not reference any information obtained

indirectly by the Government as a result of SHARAPKA's statements during the proffer sessions.

**CONCLUSION**

For the forgoing reasons, the defendant's Motion to Dismiss the Superseding Indictment

should be denied.

Respectfully Submitted,

MICHAEL J. SULLIVAN
United States Attorney
By:

*S7 ½ ½c*

SETH P. BERMAN
Assistant U.S. Attorney
(617) 748-3385

December 22, 2005

---

[2] Heath Kennedy is referred to in Exhibit 5 as the "white male" who met with
SHARAPKA. His name is not specifically mentioned.

9

## CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by causing it to be mailed through the United States Postal Service to:

Francisco Fernandez
Denner Associates
4 Longfellow Place, 35th Floor
Boston, MA 02114

This 22nd day of December 2005.

SETH P. BERMAN
Assistant U.S. Attorney



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

January 31, 2005

George F. Gormley, Esq.
655 Summer Street
Boston, MA 02210

    Re:  United States v. Oleksiy Sharapka
          Criminal Number 05-10004-PBS

Dear Sir:

This letter confirms that the United States Attorney for the District of Massachusetts will consider an accurate and complete proffer from your client, Oleksiy Sharapka (hereinafter "Sharapka"), in connection with an investigation of mail fraud, wire fraud, access device fraud, and identity theft. The terms under which the contemplated proffer will be received are as follows:

1. No statements made or other information provided by Sharapka will be used by the United States Attorney directly against him, except for purposes of cross-examination and/or impeachment should he offer in any proceeding statements or information different from statements made or information provided by him during the proffer, or in a prosecution of Sharapka based on false statements made or false information provided by Sharapka.

2. The government may make derivative use of, or may pursue any investigative leads suggested by, any statements made or other information provided by Sharapka in the course of the proffer. Any evidence directly or indirectly derived from the proffer may be used against him and others in any criminal case or other proceeding. This provision is necessary in order to eliminate the possibility of a hearing at which the government would have to prove that the evidence it would introduce is not tainted by any statements made or other information provided during the proffer. See Kastigar v. United States, 406 U.S. 441 (1972).

Case 1:05-cr-10004-PBS    Document 39-2    Filed 12/22/2005    Page 2 of 2

Sharapka Proffer Letter
Page 2

3.    Sharapka acknowledges that the making of a proffer pursuant to this agreement does not constitute substantial assistance within the meaning of 18 U.S.C. §3553(e) or §5K1.1 of the United States Sentencing Guidelines and does not provide a basis for a departure from an otherwise applicable minimum mandatory sentence or Sentencing Guideline range.

The United States Attorney is not hereby agreeing that he will subsequently enter into a plea or immunity agreement with your client.  The foregoing is the complete agreement between your client and the United States Attorney with regard to your client's proffer.

Very truly yours,

MICHAEL J. SULLIVAN
United States Attorney

By:

STEPHEN P. HEYMANN
ALLISON D. BURROUGHS
JEFFREY AUERHAHN
Assistant U.S. Attorneys

Acknowledged and agreed to:

OLEKSIY SHARAPKA

GEORGE F. GORMLEY, Esq.
Counsel for SHARAPKA

_1-31-05_
DATE

_1-31-05_
DATE

FD-302 (Rev. 10-6-95)



- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    02/02/2005

    OLEKSIY OLEKSANDDRICH SHARAPKA, born 05/10/1980, SSAN 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, of 67 Euston Street, Brighton, MA, was interviewed as part of a Proffer Agreement, which was signed by SHARAPKA in the presence of his attorney GEORGE F. GORMLEY, ESQ., of 655 Summer Street, Boston, MA. Also present during the interview were Assistant United States Attorney ("AUSA") Seth Berman, AUSA Allison Burroughs, AUSA Jeffrey Auherhahn, AUSA Steve Hyman, U.S.S.S. ATSAC Timothy Buckley, and TFO Val Krishtal. After being advised of the identity of the interviewing Agent and the nature of the interview, SHARAPKA provided the following information:

    SHARAPKA advised that he was from Kiev, Ukraine. SHARAPKA's family still lives there including his father OLEKSANDER SHARAPKA, his mother TAMARA SHARAPKA, and his sister. He attended the National University in Kiev, Mohyla Academy and received a Bachelor's degree in Economics. SHARAPKA also received a Master's Degree in Applied Mathematics from the Department of Mechanics and Mathematica at the National University.

    On August 15, 2001, SHARAPKA came to Boston, MA to pursue his Doctorate Degree in Economics from Boston College. SHARAPKA advised that he legally obtained his passport through the U.S. Embassy. SHARAPKA received a federal grant of approximately $45,000 to pursue his PHD at Boston College. SHARAPKA advised that he lived at 1955 Commonwealth Ave, Brighton, MA and on Lakeshore Court, Brighton, MA while he lived in Boston, MA.

    SHARAPKA advised that his attending Boston College did not work out for him, and that he left the United States and went back to Kiev. While in Kiev, he obtained his Master's Degree in Applied Mathematics from National University.

    On June 7, 2002, SHARAPKA left Kiev and traveled legally back to the United States. This time he arrived one (1) month prior to classes starting at the Georgia State University Andrew Young School of Policy Studies. SHARAPKA arrived early at Georgia State so that he could get settled and get a job to make some extra money. At this time, SHARAPKA met PAVEL LNU, ICQ nickname "PASHA", who was a programmer. PAVEL LNU lived in the United States.

---

Investigation on    01/31/05    at  Boston, MA

File # 288A-BS-94619

Date dictated    02/02/2005

by    SA Christopher A. Geary:cag CAG

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

FD-302a (Rev. 10-6-95)



288A-BS-94619

Continuation of FD-302 of ___ OLEKSIY SHARAPKA ___ , On 01/31/05 ___ , Page 2

  SHARAPKA advised that he answered an advertisement online
at a job posting site and unknowingly became a reshipper for people
committing fraud.  In exchange for reshipping the products,
SHARAPKA was to receive payments for each package shipped.  On
September 3, 2002, Detective Watson of the Atlanta Police
Department arrested SHARAPKA.  SHARAPKA spent a few months at
Fulton County Jail before being extradited to Ohio to face charges.
While in Fulton County, SHARAPKA met BILL HUGHES who was facing
charges from the Bureau of Alcohol, Tobacco, and Firearms and
Explosives ("ATF").  SHARAPKA spent three (3) days in an Ohio
Immigration Prison before being released.  After being released,
SHARAPKA contacted ELI GAULTNEY, HUGHES's Grandfather.  GAULTNEY
took in SHARAPKA after sending him $100.00 for a bus ticket.
GUALTNEY lives at 3012 Grand Avenue, Atlanta, GA.  HUGHES is
currently still in prison at Fulton County.

  At this time, SHARAPKA was disappointed that his career
was destroyed.  His family in Kiev sent him money to obtain a
lawyer in Atlanta, GA.  Sharapka did not tell anybody about his
arrest resulting from a complaint in Ohio.

  While living with GAULTNEY, SHARAPKA advised that he
started working as a reshipper again with the same people, "IGOR"
and "MISHA."  SHARAPKA advised that PAUL KONSTANTINOFF, who lives
in Russia, is also involved in having merchandise that was
purchased with stolen credit card numbers sent to Russia.  SHARAPKA
met OLGA FNU while living in Atlanta, GA.  They were introduced by
someone online.  SHARAPKA was told that some people in Atlanta
needed some help, so he met up with OLGA FNU and her husband.  OLGA
FNU works for several people like "PAVEL" in these Internet scams.
SHARAPKA advised that OLGA FNU is a co-defendant in his case with
the United States Secret Service ("USSS").

  "TOEFFEL" (ICQ nick name), who lives in the Baltic States
(Estonia), is 45 years old and has three (3) children.  SHARAPKA
advised that he maybe linked to the mafia, due to past
conversations with TOEFFEL, where he spoke of his criminal
connections.  TOEFFEL is considered a "middleman" in these Internet
scams.

  "INCAGE" (ICQ nick name), is the "biggest" and most
organized individual behind the Internet credit card
fraud/reshipper scams.  SHARAPKA has dealt with INGAGE for a couple
of months.  INCAGE ships two (2) shipments a month from New York
City.  INCAGE owns a shipping company there, and his reshippers

FD-302a (Rev. 10-6-95)

COPY

288A-BS-94619

Continuation of FD-302 of ___OLEKSIY SHARAPKA___ , On _01/31/05_ , Page ___3___

send their acquired products to the shipping company in C/O GEORGE TURAEV. The shipping company was named "something" International Shipping. SHARAPKA advised that the name of the shipping company should be in his computer. INCAGE had his people order their fraudulent purchases and have them shipped to SHARAPKA's mail drop addresses. SHARAPKA would then package up the stolen merchandise and send it to the shipping company. SHARAPKA stated that INCAGE's two (2) monthly shipments totaled 1500 Kg. each. INCAGE has several storefronts in Russia where he sells this stolen merchandise. SHARAPKA stated that he had previously talked with INCAGE via telephone, but could not remember the telephone number.

"MISHA" is assumed to be located in Moscow, Russia. MISHA deals in ATM and debit card information. MISHA has people located in London, Canada, Chicago, and California who are withdrawing monies from ATM accounts. MISHA's Canadian contacts were supposedly arrested. No date of arrest was provided by SHARAPKA.

SHARAPKA stated that a female known as "KYLAKA" initiated an Internet scam for seven (7) months and made $3.5 million and then retired. SHARAPKA advised that everyone is making money on these scams.

SHARAPKA also stated that in Chicago, IL, there is a group of people who are using ATM/debit card information obtained from "phishing" scams to withdraw $70,000 to $90,000 per day from ATM machines. These individuals work under MISHA. MISHA wanted the Chicago group to give SHARAPKA cash and he would send MISHA money through WEBMONEY, a Russian based Internet Money Exchange like PAYPAL. SHARAPKA stated that WEBMONEY is preferred in these transactions because it is based in Russia and is not law enforcement friendly. SHARAPKA advised that the people in Chicago are having trouble moving the money back to MISHA in Russia. Currently, they are transferring the money back to MISHA through wire transfers.

MISHA offered SHARAPKA an offer to receive 35% per week for transferring monies of up to $100,000 per week to MISHA through WEBMONEY. SHARAPKA advised that this money was being taken from ATM cards transactions in Chicago, and he believed the victim company was Citizens Bank. SHARAPKA advised that all the banks are being victimized by these scams. Wells Fargo and Citibank are banks that have ATM cards that only allow for small amounts of monies to be withdrawn at a time.

FD-302a (Rev. 10-6-95)

COPY

288A-BS-94619

Continuation of FD-302 of ____OLEKSIY SHARAPKA____ , On __01/31/05__ , Page __4__

       SHARAPKA advised that the ATM withdrawals are occurring in California as well. SHARAPKA had talked on ICQ with one (1) of the people withdrawing the money, but he could not remember this person's ICQ nickname.

       SHARAPKA advised that he worked with four (4) males that left the United States on August 28, 2004. The four (4) males names were DENNISS BOBROVSKI, ALEXANDER FNU, ANDREI VOLGIN, and ALEKSEI USKOV. SHARAPKA advised that these individuals were visiting the U.S. legally during their summer college break. They were here to participate in these schemes, and were originally in the Carolina or Virginia area and worked their way north to Boston. SHARAPKA advised that it is common for Russian students to come to the U.S. for a couple of months to work these schemes.

       SHARAPKA advised that after cutting off his monitoring bracelet that he received to enable him to cooperate with the USSS in their investigation, he decided to travel back to Boston, MA. He traveled with David Benson. SHARAPKA received $3,500 from a Russian friend and received the money via Western Union. BENSON disappeared after stealing some of the money received from Western Union. SHARAPKA had already paid for his apartment in Brighton, MA. He needed to make money, so he went to PC CAFE located in Brighton, MA where he met JIONG JIONG. There, SHARAPKA paid $2.00/hour for Internet access. ICQ nick name "B1" had a few laptop computers sent to SHARAPKA's mail drops. SHARAPKA made money for accepting the shipments. SHARAPKA went on to receive more merchandise, but did not like to deal in anything less than $1,500. SHARAPKA stated that it was not profitable for him to receive anything with a value under $1,500 due to it having to be resold at a discount because of it being stolen. SHARAPKA advised that he would come up with or have his runners come up with five (5) new addresses each week near student apartments to use to have merchandise delivered. SHARAPKA would have his "runners" wait outside these addresses and wait for the deliveries. SHARAPKA kept a document on his computer that kept track of his addresses and what was being shipped.

       SHARAPKA advised that he would provide mail drop addresses to free lance "guys" on the ICQ as well. He would make sure that no two (2) companies would deliver to the same address on the same day. He viewed it as five (5) addresses accepting deliveries from five (5) different companies would net him 25 packages per day. He advised that the people who lived at the

FD-302a (Rev. 10-6-95)

COPY

288A-BS-94619

Continuation of FD-302 of ___OLEKSIY SHARAPKA___ , On _01/31/05_ , Page __5__

residences did not know their addresses were being used as "mail drops."

SHARAPKA advised that he was paid for his services by Western Union and PAYPAL. His PAYPAL account is in his real name. SHARAPKA also has a WEBMONEY account. SHARAPKA advised that VADEAM is a person located in New York City, NY that exchanges any kind of money. VADEAM takes a high percentage of the money in order to transfer the monies. VADEAM does this through a company that he runs in NY. Information related to VADEAM may be in SHARAPKA's Internet Favorites on his laptop computer.

SHARAPKA advised that a newer scam occurring on the Internet by JIONG JIONG in Brighton, MA. JIONG has recruited 5-10 people to place 5-10 Ebay auctions for electronics like computers. Once the auctions are over, and the they receive their payments from the bidders, JIONG and his crew will use stolen credit card information to purchase the merchandise from legitimate websites and have the merchandise shipped directly to the winner of the Ebay auction.

Another scam being done with stolen credit card information is that it will be used to fund a phony online gambling account like on PARTYPOKER.COM. The user will transfer $5,000 or $10,000 to the account and gamble with it. If they win big, they will transfer the money back to the credit card, if the lose, they will "walk away" from that gambling account.

SHARAPKA advised that he used the aliases ALEX YANNOS and had a MAILBOXES ETC. as an "official" address. He also used ANDREW SCHAMKOFF and/or ANDREW SCHWANKOFF. SHARAPKA was involved in receiving and reshipping merchandise received from fraudulent purchases made on the Internet, providing online Casino accounts, and transferring monies for other individuals. SHARAPKA utilized the email accounts BERTTRONIS@YAHOO.COM, JABENNING2000@YAHOO.COM, ALL2BUSY@YAHOO.COM, and POLEMICOS@YAHOO.COM. SHARAPKA's Internet nickname was "ARTIST", which he acquired from playing billiards.

SHARAPKA advised that of his ICQ list, all but approximately 10 were involved in some aspect of the "phishing"/"reshipper"/"account information seller"/"ATM account fraud" scams. SHARAPKA ICQ list has over 200 ICQ nickname contacts in it. The group "COWORKERS" on his ICQ list are people who performed a similar job as he did as a reshipper. PROVERKA means "checking of dumps", and these people were usually from CARDER

FD-302a (Rev. 10-6-95)



288A-BS-94619

Continuation of FD-302 of ___OLEKSIY SHARAPKA___ , On __01/31/05__ , Page __6__

PLANET. ZAKAZCHIKI were people who ordered the merchandise ("technicians").

SHARAPKA advised that "technicians" fill orders online. They are supplied with credit card information and with mail drop information. To purchase the credit card information it usually costs between $1.50 to $2.00 per card. Some cards are more expensive. SHARAPKA advised that there are only about ten (10) main credit card suppliers on the Internet. They obtain this information from hacking into online companies and obtaining the credit card "dump" files from them.

Social Security Account Number ("SSAN") information is also for sale online. People have services were it would cost $3.00 each or $20.00 per month if you needed a lot of SSANs.

SHARAPKA advised that there are two (2) people who provide "Mother Maiden Name" information. They are "BM", aka "BIG BUYER", and "ZOOMER", who may now be using the nickname "SCELET", meaning skeleton. BM had ties to CARDER PLANET. BM has associates that carry machine guns, and he has contacts with Customs in Russia. BM is from MINSK, RUSSIA.

SHARAPKA advised that there are approximately four (4) portals out there for obtaining the credit card/debit card/personal information on the Internet. One is WWW.MAZZAFUKKA.COM, the others should be in his "Favorites" list on his laptop computer.

SHARAPKA also met someone online who was to send him ten (10) installments of $500.00 each from online gambling sites. He was to receive these installments through PAYPAL. SHARAPKA was to convert this money over to EGOLD to transfer over the UNSUB who contacted him. SHARAPKA stated that this deal fell through. SHARAPKA's EGOLD account is in his true name, as is his PAYPAL account with email address POLEMICOS@YAHOO.COM.

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of transcription    02/14/2005

OLEKSIY OLEKSANDDRICH SHARAPKA, born 05/10/1980, SSAN
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, of 67 Euston Street, Brighton, MA, was interviewed as
part of a Proffer Agreement, which was signed by SHARAPKA in the
presence of his attorney Christie M. Charles, of 655 Summer Street,
Boston, MA.  Also present during the interview were Assistant
United States Attorney ("AUSA") Seth Berman, U.S.S.S. SA Dean
Tramontana, and Postal Inspector Paul Chisolm.  After being advised
of the identity of the interviewing Agent and the nature of the
interview, SHARAPKA provided the following information:

SHARAPKA advised that JIONG JIONG of Brighton, MA is a
"nobody" in the "phishing"/credit card fraud/reshipping scene.
SHARAPKA advised that JIONG may have only done 20 items totaling
approximately $4,000.  SHARAPKA and JIONG would split monies when
they worked together.  JIONG may have also had to pay other people
who he had help him through his share.  SHARAPKA had to pay 80% of
the money made  to "THEVIVER."  SHARAPKA advised that "THEVIVER" is
a 33 year old male who resides somewhere in Eastern Europe.
"THEVIVER" has contacts with Ukrainian Customs in order to receive
merchandise shipments in his country.

SHARAPKA advised that "CYCLONE" is another person that he
would deal with online through ICQ.  "CYCLONE" resides in Hungary.

SHARAPKA advised that at least five (5) individuals who
use ICQ possess over 1 million credit card numbers.  SHARAPKA
provided "THEVIVER", "B1", "PASHA", and "INVEXOR" as ICQ nicknames
that possess that many stolen credit card numbers.  SHARAPKA
advised that "DEC" of shadowcrew had offered "INVEXOR" the job of
running the Russian part of SHADOWCREW.  "DEC" is supposedly still
wanted by the U.S.S.S. for his/her participation in SHADOWCREW.

SHARAPKA advised that VADEAM LNU, may run the website
"EUROCARD2000."  VADEAM LNU has a female manager that SHARAPKA had
talked to once on the telephone.  SHARAPKA does not recall her
name.

SHARAPKA advised that he was ordering IDs online for
himself and his runners.  SHARAPKA ordered his IDs from a person in
OHIO.  SHARAPKA advised that "DEV" also of SHADOWCREW sold IDs.

Investigation on    02/14/05    at  Boston, MA

File # 288A-BS-94619          Date dictated  02/17/2005

by    SA Christopher A. Geary

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;

FD-302a (Rev. 10-6-95)



288A-BS-94619

Continuation of FD-302 of ___OLEKSIY SHARAPKA_____ , On _01/31/05_____ , Page ___2___

        SHARAPKA advised that he was ordering IDs online for
himself and his runners. SHARAPKA ordered his IDs from a person
in OHIO. SHARAPKA advised that "DEV" also of SHADOWCREW sold
IDs. "DEV" is a 45 year old male, who had his wife or girlfiend
accept the Western Union transfers for the IDs. "DEVI-DOKI"
charged $200 for one (1) ID and $30 each if purchased in
quantities. SHARAPKA would take the pictures of who he wanted
on the IDs, "zip" (compress) the pictures and send it with a
text file containing personal information that he wanted on the
ID to the ID makers via ICQ.

        When questioned about the 59 white plastic cards having
magnetic strips on the back, SHARAPKA advised that he was
working with "MISHA" and received the track 2 data from "MISHA"
to write on the magnetic strips. SHARAPKA advised that they
cards contained debit or credit card information. SHARAPKA
advised that he had only used a few of them. "MISHA" reportedly
developed an altorythm to determine useable cards. MISHA
reportedly has people working for him in Chicago and California.
"MISHA's" groups have moved away from WELLS FARGO debit cards
and may be victimizing SOVEREIGN BANK debit cards. SHARAPKA
advised that while working with "MISHA", he would have to encode
the cards within 30 minutes of receiving the track 2 data and
then attempt to utilize the cards at ATMs. SHARAPKA advised
that an Unidentified Male from California sent him the white
plastic cards and taught him how to organize the scheme, by
splitting the cards into 10 at a time. SHARAPKA advised that he
thought "MISHA" obtained the credit card information through
"phishing" schemes.

        SHARAPKA advised that he worked with "MISHA" in order
to make extra money aside from his reshipping scheme. SHARAPKA
was to receive 35% of the proceeds from the unauthorized ATM
transactions. No deals were made with "MISHA" due to SHARAPKA
being arrested on his current charges.

        SHARAPKA advised that he was introduced to a Lithuanian
male and female who lived by Boston College by HUDUZNIK
PETROVICH. PETROVICH does not live within the United States.
The Lituanian male's name may be "VICTOR." The male's
ICQ name was "DIGITAL", and the female's ICQ name was "STULJA."
"STULJA" reportedly had red curly hair. SHARAPKA advised that
he believed "VICTOR" may have had laser eye surgery and that
"VICTOR" was leaving the United States some time in October
2004. "VICTOR" was considered a competitor of SHARAPKA's in

FD-302a (Rev. 10-6-95)



288A-BS-94619

Continuation of FD-302 of _____ OLEKSIY SHARAPKA _____ , On 01/31/05 ___ , Page ___3___

reshipping of merchandise, so they did not discuss too much
about what or who they were working with.  The file named
"Log1.htm" maybe victors, and appears to track debts owed
because of participation in a fraudulent credit card scheme.
The term "dolg" means "debt."

The person utilizing the ICQ nickname "LAPTOPSELLER"
places ads on job placement sites like MONSTER.COM, and recruits
unknowingly individuals to be reshippers.  "LAPTOPSELLER" is
located in Russia and deals in large quantities of laptop
computers.

The person utilizing the ICQ nickname "NADA" produces
state ID cards.  "NADA" is believed to be located in Phoenix,
AZ.

"BRATOK-US" was believed to be living in California,
but may have moved to Russia, France, or Canada.

SHARAPKA provided information related to the following
ICQ nicknames:

"CLOWN" - does a lot of small fraudulent orders
"VALIN" - lives in Australia
"BASIC" - purchases merchandise and has MailBox Etc. resend it
"PARADISE" - Russian working in New York City
"K-OFF" - Konstantinoff
"NOAR" - lives in Canada

SHARAPKA also identified the person in picture named
"d.jpg" from his laptop as DAVID BENSON.  The person in picture
named "0142.jpg" is known on ICQ as "HIMIKAT."  The person in
picture named "IMG 004.jpg" is DENNIS BOBROVSKI.

When asked about the picture named "Union
Bank_inco.jpg", SHARAPKA did not know who MIKAJEL TUMASYAN was
and advised that he only knew of three (3) people from TUNISIA
on ICQ.

When asked about the picture file named "0202.bmp",
SHARAPKA advised that it was the banking information for his
Mother's bank account in Kiev.

FD-302a (Rev. 10-6-95)



288A-BS-94619

Continuation of FD-302 of ___OLEKSIY SHARAPKA_____ , On _01/31/05___ , Page __4__

        SHARAPKA advised that he did not have an XDRIVE online storage account, nor did he have any other online storage accounts where he stored files.

        Credit Reports found on his laptop computer's hard drive were purchased from ICQ nickname "SKELET." SHARAPKA used them for fake identification cards.

        The NETSPEND cards were supposed to be for "clean" money that was obtained through these scams. NETSPEND allows a person to open three (3) different accounts in their name.

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription  06/28/2005

OLEKSIY OLEKSANDDRICH SHARAPKA, born 05/10/1980, SSAN 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, of 67 Euston Street, Brighton, MA, was interviewed as part of a Proffer Agreement, which was signed on 01/31/2005 by SHARAPKA in the presence of his attorney GEORGE F. GORMLEY, ESQ., of 655 Summer Street, Boston, MA. Also present during the interview were SA C.J. Sperber (FBI), U.S.S.S. SA Scott Colin, and Christie M. Charles representing SHARAPKA. After being advised of the identity of the interviewing Agent(s) and the nature of the interview, SHARAPKA provided the following information:

SHARAPKA advised that he first came to the Boston, MA area on July 1, 2004 with DAVID BENSON. BENSON and SHARAPKA traveled from Atlanta, GA. SHARAPKA stated that BENSON stole checks from him, cashed them, and was not seen by SHARAPKA again.

SHARAPKA advised that they were using stolen American Express credit card numbers that they purchased online. The American Express website offers for purchase traveler's checks and currency. SHARAPKA would use stolen credit card information that he obtained online to order American Express traveler's checks. The checks would be sent out the next day. SHARAPKA advised that anything under $2,500.00 was not checked by American Express. SHARAPKA stated that he usually ordered the checks for $1,000.00 not to raise any flags.

In possible August of 2004, BENSON moved to a homeless shelter, where he met HEATH LNU and two (2) other men. SHARAPKA and HEATH LNU started to "work" together on the Internet scams. BENSON did not work with SHARAPKA and HEATH LNU. SHARAPKA's role was to handle all of the online communicating with the people who had the credit/bank card information. HEATH's role was to be that of a runner.

Around September 10-15, 2004, SHARAPKA chatted online with HOUDOZNIK. HOUDOZNIK, who lives in Eastern Europe, was working with VICTOR LNU, aka "DIGITAL", who was attending a university in the Boston area. VICTOR lived on Washington Street, Brighton, MA. VICTOR had a girl friend who was small in stature and from Lithuania. SHARAPKA stated that he had spoken with VICTOR and that they had talked about obtaining false IDs. SHARAPKA game the ICQ number of his ID guy. SHARAPKA also gave VICTOR $600.00

| Investigation on | 05/26/05 | at Boston, MA | | |
|---|---|---|---|---|
| File # 288A-BS-94619 | | | Date dictated | 06/01/2005 |
| SA C.J. Sperber | | | | |
| by SA Christopher A. Geary:cag | | | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

FD-302a (Rev. 10-6-95)



288A-BS-94619

Continuation of FD-302 of ___OLEKSIY SHARAPKA_____ , On _05/26/05_ , Page __2__

for money to live on, because he was a friend of HOUDOZNIK.
SHARAPKA advised that VICTOR was receiving packages of merchandise
paid for by stolen credit card numbers at his true residence at one
time.  VICTOR moved from that address.

        SHARAPKA stated that in the Fall of 2004, five (5) males
came to the U.S. from Russia.  They were working for HOUDOZNIK and
VICTOR and started working fraud schemes in North Carolina.
SHARAPKA advised that he asked VICTOR if he could use them too.
The five (5) males were all from the Tallin University, same as
VICTOR.  Among the five (5) males were ALEXI USKOV, DENNIS
BOBROVSKI, and ALEXANDER LNU.  The five (5) males would pick up
packages for VICTOR and HOUDOZNIK's online scams.

        One (1) scam that SHARAPKA operated while in Atlanta, GA
was regarding NETSPEND CARDS and PAYPAL accounts.  SHARAPKA advised
that NETSPEND prepaid cards allow for monies to be withdrawn at ATM
locations.  Money can be transferred to NETSPEND Cards through
PAYPAL transfers.  NETSPEND never sent any of the unauthorized fund
transfers back to the PAYPAL accounts even after they were
identified as fraudulent.  The scam entailed using small PAYPAL
accounts to fund larger PAYPAL accounts, and then cleaning out the
large PAYPAL accounts via check, a clean bank account, or NETSPEND
accounts.  SHARAPKA advised that "THE VIVER" was the biggest player
doing this scam.
        SHARAPKA also advised that his sister, who lives in Kiev,
has been using his ICQ nickname and has recently chatted with "THE
VIVER."  SHARAPKA advised that she has taken over his online ICQ
identity so that he can be paid by people who still owe him money
from the Internet scams and so that he can pay the people he owes
money to for his role in the scams.  SHARAPKA advised that he owes
$20,000 to "ESTESIS" from Estonia, and $15,000 to $20,000 to IGOR
MANKOVSKY for the vehicles that were seized by the U.S.S.S.  He
estimated that he owes approximately $60,000 to people that he
worked with on these Internet scams.

        SHARAPKA advised that the person responsible for shipping
containers full of merchandise fraudulently obtained through stolen
credit card purchases is GEORGE TURAEV, who is located in Syracuse,
NY.

        SHARAPKA advised that while living in Atlanta, GA, he
worked with ANDREI BELIKOFF and his wife, who were acting as the
"middle man" in receiving packages from online fraudulent credit

FD-302a (Rev. 10-6-95)

COPY

286A-BS-94619

Continuation of FD-302 of    OLEKSIY SHARAPKA    , On 05/26/05 , Page 3

card orders.  Also in Atlanta is OLGA SHUSKOVA, who moves money through Western Unions, etc.

VADEAM, who owns a legitimate company in New York, is a money casher.  VADEAM primarily transfer cash into WEBMONEY or EGOLD.

KONSTANTINOFF has people accepting packages for him in NY and FL.  KONSTANTINOFF resides in Eastern Europe.

SHARAPKA advised that their were four (4) individuals who had the capability to make false identifications. The first one (1) is "NADA."  NADA lives in Chicago, IL and makes California and Arizona driver's licenses.  NADA have never been arrested.  SHARAPKA dealt with NADA when SHARAPKA was in Atlanta.

The second person for false IDs is "DIRTY HARRY."  DIRTY HARRY was arrested during the Carder Planet roundup.  DIRTY HARRY makes false Michigan driver's licenses.

The third person SHARAPKA stated that made false driver's licenses was "DEV."  DEV can make any state ID.  DEV lives in Ohio and is over 50 years old.

The fourth person who makes false IDs is "ASAD."  ASAD lives in Moscow.

SHARAPKA also advised that "PINECHOT" is known to be the best supplier of fraudulent passports.

SHARAPKA advised that MISHA is behind a large portion of the unauthorized withdrawals being made at ATM machines in Chicago, IL.  MISHA's ICQ nickname is "MICHAIL."  MISHA is known to behind the WELLS FARGO and CITIZENS phishing scams.

TOEFFEL is behind the unauthorized ATM transactions in London England.



## Boston Police Department
## Mugshot Form

Report Date: 11/07/2004 12:01
Booking Status: Verified
Printed By: MARROW, Stephanie

**Master Name:** SCHWAMKOFF, Andrew
**Booking Name:** SCHWAMKOFF, Andrew
**Address:** 67 Euston RD #2, BRIGHTON MA 02135 US
**Charges:** Larceny Over $250 (266-30)
Fraudulent Use Of A Credit Card (266-37C)
Buying, Receiving or Concealing Stolen Goods (266-60)
**Sex:** Male
**Date of Birth:** 09/29/1976
**Height:** 6'00
**Weight:** 195    lbs
**Eye Color:** Hazel
**Hair Color:** Black
**Race:** White Non-Hispanic
**Booking No:** 04-00688-14
**Booking Date:** 11/05/2004 21:33
**Incident Number:** 040602948
**CR No:** 006106-04
**State No:** 10229669
**FBI No:** 614635CC4







## Boston Police Department
## Mugshot Form

Report Date: 11/07/2004 12:01
Booking Status: Verified
Printed By: MARROW, Stephanie

**Master Name:** SCHWAMKOFF, Andrew
**Booking Name:** SCHWAMKOFF, Andrew
**Address:** 67 Euston RD #2, BRIGHTON MA 02135 US
**Charges:** Larceny Over $250 (266-30)
Fraudulent Use Of A Credit Card (266-37C)
Buying, Receiving or Concealing Stolen Goods (266-60)
**Sex:** Male
**Date of Birth:** 09/29/1976
**Height:** 6'00
**Weight:** 195    lbs
**Eye Color:** Hazel
**Hair Color:** Black
**Race:** White Non-Hispanic
**Booking No:** 04-00688-14
**Booking Date:** 11/05/2004 21:33
**Incident Number:** 040602948
**CR No:** 006106-04
**State No:** 10229669
**FBI No:** 614635CC4





COPY

# Boston Police Department
## Arrest Booking Form

**Report Date:** 11/01/2001 12:01
**Booking Status:** Verified
**Printed By:** MARROW, Stephanie

**District:** 14    **UCR Code:** 0619

**Court of Appearance:** Brighton District Court

**Master Name:** SCHWAMKOFF, Andrew    **Age:** 28

**Location of Arrest:** 67 Euston Road, Allston / Brighton




**Booking Name:** SCHWAMKOFF, Andrew

**Alias:**

**Address:** 67 Euston RD #2, BRIGHTON MA 02135 US

**Charges:**

Larceny Over $250 (266-30)

Fraudulent Use Of A Credit Card (266-37C)

Buying, Receiving or Concealing Stolen Goods (266-60)

Identity Fraud

Possession of Counterfeit Credit Cards

Altered License or Registration (90-24B)

| **Booking #:** 04-00688-14 | **Incident #:** 040602948 | **CR Number:** 006106-04 |
|---|---|---|
| **Booking Date:** 11/05/2004 21:33 | **Arrest Date:** 11/05/2004 21:30 | **RA Number:** |

**Sex:** Male    **Height:** 6'0    **Co-operative:** No

**Race:** White Non-Hispanic    **Weight:** 195    **lbs**    **Employer/School:** Self Employed

**Date of Birth:** 09/29/1976    **Build:** Medium    **Emp/School Addr:** 67 Euston Road,

**Place of Birth:** BREMEN GE    **Eyes Color:** Hazel    Brown    **Social Sec. Number:**

**Marital Status:** Single    **Hair Color:** Black    **Operators License:**

**Mother's Name:** ANDRUSHENKO, Tamara I    **Complexion:** Medium    **State:** MA

**Father's Name:** SCHWAMKOFF

**Drugs Used:** No    **Scars/Marks/Tattoos:**

**Examined at Hospital:** No    **Clothing Desc:** Dark Blue Sweater, Grey Sweat Pants, Black & Red

**Breathalyzer Used:** No    Running/Training Shoes

**Examined By EMS:** No

| **Arresting Officer:** BPD | 11708 | Krause, Eric | **Cell Number:** 2 |
|---|---|---|---|
| **Booking Officer:** BPD | 10587 | Sheridan, Robert | **Partner's #:** 08821 |
| **Informed of Rights:** BPD | 11733 | Romano, Stephen | **Unit #:** V808 |
| **Placed In Cell By:** BPD | 10587 | Sheridan, Robert | **Trans Unit #:** VK06 |
| **Searched By:** BPD | 11733 | Romano, Stephen | |

| **Cautions:** | **Booking Comments:** | **Visible Injuries:** |
|---|---|---|
| | NOT ON SUICIDE LIST | NONE NOTED |

**Person Notified:** | **JUVENILE INFORMATION** | **Phone:**
**Address:** | **Relationship:** |
**Notified By:** | **Juv. Prob. Officer:** |
| | **Notified Date/Time:**

**Bail Set By:** | I Selected the Bail Comm.
**Bailed By:** |
**Amount:** |
| *Signature of Prisoner*

| **BOP Check:** BPD | 10587 | Sheridan, Robert |
|---|---|---|
| **Supco Check:** | | |
| **BOP Warrant:** | | |
| **BOP Court:** | | |



*Signature of Duty Supervisor*

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☒  SUPPLEMENTARY ☐

| KEY SITUATIONS | | | | COMPLAINT NO 040602948 | | REPORT DIST. D14 | CLEARANCE DIST |
|---|---|---|---|---|---|---|---|
| TYPE OF INCIDENT LARCENY, SCHEME | | CRIME CODE 0 | | STATUS | | DATE OF OCCUR A.11/05/04 | B. |
| LOCATION OF INCIDENT 67 EUSTON RD | | | | APT. 2 | DISPATCH TIME 08.43 PM | TIME OF OCCUR. A.09.30 PM | B. |

| VICTIM-COMP. (LAST, FIRST, MI) LONG,ALFRED | | PHONE (770)-422-8002 | SEX MALE | RACE | | | MARITAL STATUS |
|---|---|---|---|---|---|---|---|
| ADDRESS 1101 WHITLOCK AVE,MARIETTA,GA,30064-0000 | | APT. | OCCUPATION | | | AGE 0 | D.O.B. |

| VICTIM-COMP. (LAST, FIRST, MI) HUDUCK,KATHLENE | | PHONE (508)-748-2388 | SEX FEMALE | RACE | | | MARITAL STATUS |
|---|---|---|---|---|---|---|---|
| ADDRESS 6 ARROW HEAD LANE,MARION,MA,02738-0000 | | APT. | OCCUPATION | | | AGE 0 | D.O.B. |

| VICTIM-COMP. (LAST, FIRST, MI) DROPSKI,DAN | | PHONE (000)-000-0000 | SEX MALE | RACE | | | MARITAL STATUS |
|---|---|---|---|---|---|---|---|
| ADDRESS 366 MENAUHANT RD,EAST FALMOUTH,MA,02536-0000 | | APT. | OCCUPATION | | | AGE 0 | D.O.B. |

| PERSON REPORTING DET. ERIC KRAUSE | ADDRESS 1 SCHROEDER PLAZA,BOSTON,MA,02120-0000 | | APT. | PHONE (617)-343-5200 |
|---|---|---|---|---|

WAS THERE A WITNESS TO THE CRIME

| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE | |
|---|---|---|---|---|---|---|---|
| DET. BLAIR, SIU | 0 | | | 1 SCHROEDER PLAZA,BOSTON,MA,02120-0000 | | (617)-343-5200 | RES BUS |
| POSTAL INSPECTOR PAUL CHISHOLM | 0 | | | 495 SUMMER ST,BOSTON,MA,00000-0000 | | (000)-000-0000 RES (617)-556-4472 BUS | |
| SGT. GULIANO, P.O. STANTON, P.O. KING, YVSF | 0 | | | 364 WARREN ST,ROXBURY,MA,00000-0000 | | (000)-000-0000 RES (617)-343-4444 BUS | |
| P.O. GRASSO, P.O. SWEET, P.O. MAE, YVSF | 0 | | | 364 WARREN ST,ROXBURY,MA,00000-0000 | | (000)-000-0000 RES (617)-343-4444 BUS | |
| P.O. LOONEY, P.O. NEE, P.O. MCGLAUGHLIN, YVSF | 0 | | | 364 WARREN ST,ROXBURY,MA,00000-0000 | | (000)-000-0000 RES (000)-000-0000 BUS | |
| DET. M. KANE, AREA D-14 | 0 | | | | | RES BUS | |

NUMBER OF PERPETRATORS : 1 — CAN SUSPECT BE IDENTIFIED AT THIS TIME

| | STATUS ARRESTED | NAME (LAST, FIRST, MI) SCHWAMKOFF,ANDREW | | | | S.S. NO. 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 | BOOKING NO. 20040068814 | PHOTO NO. | ALIAS SHARAKA OLEKSIY | YES NO ☒ |
|---|---|---|---|---|---|---|---|---|---|---|
| PERSONS | WARRANT NO. | ADDRESS 67 EUSTON RD,BRIGHTON,MA,02135-0000 | | | SEX MALE | RACE WHITE NON-HISPANIC | | AGE 28 | HEIGHT 6-00 | DOB 9/29/1976 |
| | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) BLUE SWEATER, GREY SWEAT PANTS, RUNNING SHOES | | | WEIGHT 195 | BUILD MEDIUM | | HAIR BLACK | EYES HAZEL | | |

CAN SUSPECT VEHICLE BE DESCRIBED

| | STATUS | | REG. STATE | REG. NO. | PLATE TYPE | | YEAR(EXP) | MODEL | | YES NO ☒ |
|---|---|---|---|---|---|---|---|---|---|---|
| VEHICLE | VEHICLE MAKE YEAR | | VEHICLE NO. | | STYLE | | | COLOR(TOP-BOTTOM) | | |
| | OPERATOR'S NAME | | | | LICENSE NO. | STATE | OPERATOR'S ADDRESS | | | |
| | OWNER'S NAME | | | | OWNER'S ADDRESS | | | | | |

CAN PROPERTY BE IDENTIFIED

| | STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO. | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR | YES NO ☒ |
|---|---|---|---|---|---|---|---|---|
| PROPERTY | SEIZED | MONEY | | - US CURRENCY | | 1400 | | |
| | SEIZED | MONEY | | - US CURRENCY | | 14280 | | |

IS THERE A SIGNIFICANT M.O.

| | TYPE OF WEAPON-TOOL | NEIGHBORHOOD | | TYPE OF BUILDING | PLACE OF ENTRY | | YES NO ☒ |
|---|---|---|---|---|---|---|---|
| M O | WEATHER | LIGHTING | TRANSPORTATION OF SUSPECT FOOT | VICTIM'S ACTIVITY | | | |
| | UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR | | | RELATIONSHIP TO VICTIM | | | |

IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE)

COPY

IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW)  ☒☐ YES NO

BLOCK NARRATIVE AND ADDITIONAL INFORMATION  ☒☐ YES NO
NO.

ON 11/5/04, DET. KRAUSE (VD05), DET. BLAIR (V808), OF THE SPECIAL INVESTIGATION UNIT AND POSTAL INSPECTOR
PAUL CHISHOLM, ARRESTED ANDREW SCHWAMKOFF FOR LARCENY BY SCHEME OVER 250, FRAUDULENT USE OF A
CREDIT CARD, RECEIVING STOLEN PROPERTY, IDENTITY FRAUD, AND ALTERING/COUNTERFEITING MA LICENSES.
THIS ARREST OCCURRED AS THE RESULT OF AN INVESTIGATION BY THE US POSTAL INSPECTORS OFFICE AND THE
SPECIAL INVESTIGATION UNIT. INSP. PAUL CHISHOLM WAS INITIALLY CONTACTED BY A VICTIM OF IDENTITY
FRAUD. THIS VICTIM REPORTED THAT AN UNKNOWN PERSON USED HER CREDIT CARD NUMBER TO ATTEMPT TO
SHIP STOLEN PROPERTY TO 304 NEWBURY ST., #397, BOSTON, IN THE NAME OF DENNISS BOBROZSKI. FURTHER
INVESTIGATION BY INSP. CHISHOLM FOUND THAT NUMEROUS PACKAGES HAD BEEN SHIPPED TO THE SAME BOX
(397) AT MAIL BOXES ETC. THAT INVOLVED STOLEN CREDIT CARD NUMBERS. INSP. CHISHOLM CHECKED WITH THE
COMPANIES THAT SHIPPED THE MERCHANDISE AND DETERMINED THAT THE CREDIT CARD NUMBERS USED TO BILL
THE MERCHANDISE DID NOT MATCH THE SHIPPING NAME. FURTHER INQUIRIES DETERMINED THAT FOUR PACKAGES
CURRENTLY AT MAIL BOXES ETC. FOR BOX 397 WERE ORDERED WITH STOLEN CREDIT CARD NUMBERS. A
SURVEILLANCE WAS CONDUCTED ON 11/5/04 AT 304 NEWBURY ST. AT ABOUT 4:35 P.M., A WHITE MALE ARRIVED AND
CLAIMED THE PACKAGES. AT ABOUT 7:00 P.M., THIS WHITE MALE MET WITH ANDREW SCHWAMKOFF ON
COLBOURNE ST AT THE INTERSECTION OF EUSTON RD. THIS WHITE MALE HAD CONVERSATION WITH SCHWAMKOFF
FOR ABOUT 5-10 MINUTES. SCHWAMKOFF HANDED AN ENVELOPE TO THE WHITE MALE. THIS ENVELOPE WAS LATE
SEIZED AND DETERMINED TO CONTAIN $1400.00 US CURRENCY. SCHWAMKOFF THEN TOOK THREE PACKAGES FROM
THE REAR OF THE CAR AND WALKED AWAY ON FOOT TO EUSTON RD. SCHWAMKOFF WALKED UP THE STEPS OF 67
EUSTON RD WHERE HE WAS STOPPED BY SGT. GULIANO, DET. BLAIR, AND INSP. CHISHOLM. OFFICERS IDENTIFIED
THEMSELVES AND SCHWAMKOFF CONSENTED TO THE OFFICERS COMING UPSTAIRS INTO HIS APARTMENT.
SCHWAMKOFF WAS READ HIS MIRANDA RIGHTS BY DET. BLAIR AND READ THE CONSENT TO SEARCH FORM. THIS
PROCEDURE WAS RECORDED ON AN AUDIO TAPE AND LATER AGAIN RECORED ON VIDEO. SCHWAMKOFF
CONSENTED TO THE SEARCH AND WAIVED HIS MAIRANDA RIGHTS AND AGREED TO SPEAK TO OFFICERS. THE
SEARCH WAS LIMITED TO SCHWAMKOFF'S ROOM. THERE WERE TWO OTHER ROOMATES IN THE APARTMENT. DET.
KRAUSE LATER SPOKE WITH KURT DINSBACH WHO STATED HE IS THE ONLY PERSON ON THE LEASE. MR. DINSBACH
STATED HE FOUND SCHWAMKOFF THROUGH AN ONLINE SERVICE. SCHWAMKOFF'S ROOM WAS FULL OF BOXES
CONTAINING COMPUTERS, COMPUTER ACCESSORIES, CAMERAS, CLOTHING, AND OTHER ITEMS TO NUMEROUS TO
INVENTORY AT THIS TIME. A SUPPLEMENTAL REPORT WILL BE FILED. OFFICERS ALSO FOUND MANY COUNTERFEIT
MA LICENSES, $14,280 IN US CURRENCY, FINANCIAL DOCUMENTS, NOTES, BLANK PLASTIC CREDIT CARDS.
SCHWAMKOFF WAS RECORDED ON VIDEO WHILE POINTING TO WHAT HE SAID WAS HIS PROPERTY AND WHAT WAS
NOT HIS PROPERTY. OFFICERS OBSERVED A LAPTOP COMPUTER POWERED ON AND CONNNECTED A PRINTER AND A
CREDIT CARD CAPTURING DEVICE COMMONLY REFERED TO AS A SKIMMER. THIS COMPUTER WAS DISCONNECTED
FROM THE PRINTER AND SKIMMER BY DET. KRAUSE. THE LAPTOP WAS POWERED B THE BATTERY AND SHUT DOWN
BY DET. KRAUSE. OFFICERS HAD PROBABLE CAUSE TO BELIVE THE COMPUTER AND ASSOCIATED EQUIPMENT WAS
BEING USED AS PART OF A CREDIT CARD FRAUD SCHEME. OFFICERS ALSO HAD PROBABLE CAUSE TO BELIEVE THAT
THE MERCHANDISE, IDENTIFICATIONS, US CURRENCY, DOCUMENTS, BLAND CREDIT CARDS, AND OTHER ITEMS
LATER TO BE INVENTORIED WERE STOLEN PROPERTY AND EVIDENCE RELATED TO THE SCHEME. THE ITEMS WERE
SEIZED AND TRANSPORTED TO BOSTON POLICE HEADQUARTERS BY THE K202F (WALSH/OREEN) AND SECURED IN
THE EVIDENCE LOCKER OF THE SPECIAL INVESTIGATION UNIT. THE CURRENCY WAS BROUGHT TO AREA D-14 AND
SUBMITTED TO THE DUTY SUPERVISOR, LT. FEENEY. THE EXACT COUNT WAS DETERMINED TO BY $14,280.00 AND
$1400.00. THE CURRENCY WAS BROUGHT TO BOSTON POLICE HEADQUARTERS BY DET. KRAUSE AND SECURED IN THE
SAFE AT THE FONT DESK. INVESTIGATIVE REPORTS TO BE SUBMITTED BY DET. KRAUSE AND POSTAL INSPECTOR
PAUL CHISHOLM. AFTER THE BOOKING PROCESS, THE SUSPECTS FINGERPRINTS MATCHED AN ARREST IN THE STATE
OF GEORGE IN THE NAME OF SHARAKA OLEKSIY. SUSPECT IS WANTED AS A FUGITIVE FROM JUSTICE FROM THE
ARLINGTON, VA OFFICE OF THE US MARSHALL. DEPUTY MARSHALL JOE SACCARDO OF THE BOSTON OFFICE, 617-
748-2561 CONTACTED AREA D-14 AND REQUESTED THAT THE SUSPECT BE HELD. THE NCIC# IS W456184973.

| UNIT ASSIGNED | TOUR OF DUTY | REPORTING OFFICER'S NAME | | REPORTING OFFICER'S ID | PARTNER'S ID | FI |
|---|---|---|---|---|---|---|
| VD05 | 2 | ERIC G KRAUSE | | 11708 | 8821 | NO |
| DATE OF REPORT | SPECIAL UNITS NOTIFIED(REPORTING) | | | | | TELETYPE NO. |
| 11/06/04 | | | | | | |
| TIME COMPLETED | PATROL SUPERVISOR NAME | | PAT. SUP. ID | DUTY SUP. NAME | | DUTY. SUP. ID |
| 01:01 AM | | | | WILLIAM CROWDER | | 6934 |



FD-302 (Rev. 10-6-95)

- 1 -

**COPY**

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   11/08/2004

On Sunday, November 7, 2004, while listening to the
news on the radio, SA Angelo A. Rinchiuso heard that a person of
Russian decent, had been arrested by the Boston Police
department and had ties to Russian Organized Crime.   SA Angelo
A. Rinchiuso immediately contacted TFO Val Krishtal and told him
to meet at the Boston Police Department, Area D-14, Brighton,
Ma. Once at that location (D-14), the desk personnel made SA
Angelo A. Rinchiuso aware that the person who was arrested by
Boston Police Department, identified as of Andrew Schwankoff,
was still being held in their lockup.  At that time Boston
Police Detective Blair was contacted at his residence, and was
advised by writer that they wanted to interview his arrestee.
Detective Blair concurred with that request as long as subject,
Andrew Schwankoff, signed off on his waiver of Prompt
Arraignment and Miranda rights.

On same date, at approximately 12:16 p.m., SA Angelo A.
Rinchiuso and TFO Val Krishtal read to Andrew Schwankoff his
Advice of Rights (form FD 395), and the Boston Police Department
Waiver of Prompt Arraignment (Rosario Waiver) at which time
Schwankoff read and then signed both. Schwankoff thereafter
voluntarily provided the following information:

Andrew Schwankoff advised that he has only been using
the name Schwankoff for about two days. It was one of the names
that he just picked out from some of his friends on ICQ.
Schwankoff stated that his true birth name is Oleksiy Sharapka
and has a date of birth of September 29, 1976. Sharapka was born
in Kiev, Ukraine.  Sharapka is the name that he officially
uses on his passport. Sharapka stated that Secret Service in
Atlanta was holding his original passport.  Sharapka has also
used the name of Alexis Llanos and several others that he
couldnot remember. Sharapka stated that the other names were on
the cards that were confiscated when he was arrested by Boston
Police on 11/05/04.

Sharapka, (Schwankoff) advised that he first obtained
his Bachelor of Arts degree in Economics from Ukraine
University. Sharapka entered the United States in 2001. Sharapka
resided in the Boston Area during the years 2001 through 2002.

Investigation on   11/07/04      at Brighton, Ma.

File # 288A-BS-94613
    SA ANGELO A. RINCHIUSO
by. TFO VAL KRISHTAL


Date dictated   11/08/04

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

FD-302a (Rev. 10-6-95)

**COPY**

288A-BS-94019

Continuation of FD-302 of _____ OLEKSIY SHARAPKA _____ , On 11/07/04 _____ , Page __2__

Sharapka advised that he was attending Boston College and was
pursuing a Doctorate in Financial Economics. Boston College had
given him a stipend of $45,000 to attend. After 2002, he moved
to the State of Georgia, where he received a Doctorate degree in
Economics from University of Georgia.

Sharapka advised that he is single and has no children.
Sharapka has a mother, father and sister who are all alive and
live in Kiev. Sharapka stated that his father was 50 years old
and his mother was 52 years old. His sister was 19 years old.
Sharapka's present address is 67 Euston rd, Apt #2, Brighton,
Ma. Sharapka advised that his personal cell phone has the number
of (404) 247-7217, and was issued by T-Mobile. Sharapka stated
that he also uses six or seven other cell phones for his
business, but did not recall the numbers. Sharapka advised that
those were the cell phones taken by Boston Police at the time of
his arrest. Those phones were also issued by T-Mobile. Sharapka
was asked where he purchased those cell phones and under what
names were they listed. Sharapka advised that he bought those
phones in Atlanta, Georgia, from a Chinese man, who owns a small
phone shop somewhere in downtown Atlanta. Sharapka stated that
the phones are not in his name, but in the names that the
Chinese man provided for him. Sharapka does not know the name
of this man and does not recall the name or address of the shop.
Sharapka continues to use his T-Mobile cell phones by buying
prepaid cards. Sharapka has about $1,000 in prepaid credit for
the phone number (404) 247-7217, which he states was his primary
phone.

Sharapka next advised that on May 17, 2004, he was
arrested by Secret Service, Atlanta, Georgia. Sharapka stated
that he was charged with nine felony counts of fraud. Sharapka
stated that he had made bail and was out under house arrest.
Sharapka stated that he had rented two apartments in Atlanta;
one to conduct his business in and the other to live in. Because
he was not able to work, his landlord became irate and removed
all of his business property from the one apartment, including
$10,000 in cash, which he had hidden in the apartment. Sharapka
stated that the landlord stole his property. Sharapka was also
evicted from the apartment that he was using as his primary
residence and had nowhere to go. Sharapka advised that after
receiving word from Secret Service Agent Benedict Murrey that he
(Murrey) was being reassigned to a Presidential detail, he
(Sharapka) decided to relocate. Sharapka said that even though
he had financial fraud charges pending against him, he decided

FD-302a (Rev. 10-6-95)

**COPY**

288A-BS-9761

Continuation of FD-302 of ____OLEKSIY SHARAPKA____ , On 11/07/04 , Page ___3___

to relocate back to the Boston area. Sharapka traveled by
Greyhound Bus to Boston, because he had no money. All of his
money had been confiscated during his arrest in Atlanta.

Sharapka advised that in the course of the Secret
Service investigation regarding his illegal activities, they
seized a shipment of three SUV vehicles that Sharapka was
sending to the Ukraine. The three SUVs were seized in Spain.
Sharapka advised that he bought two Nissans and one Infinity,
totaling in value of $150,000. Sharapka advised that the people
who paid for these SUVs in Russia, were not happy with the
seizure, because they had fronted the money for the purchase.
Sharapka advised that he was currently engaging in illegal
activities, in order to raise money to pay this debt. Sharapka
also advised that another reason he left Atlanta was that the
people he owed money believed that he might be cooperating with
the authorities.

Sharapka was next asked how many mail addresses did he
use.  Sharapka advised that he used over several P.O. Boxes
throughout the Boston Area. All of the Post Office Boxes were
associated with Mail Box Etc.  Sharapka advised that he had two
P.O. Boxes on Tremont street, under the name of Alexi Llanos.
Sharapka has another P.O. Box at 1085 Commonwealth Ave, also
under the name of Alexi Llanos. Sharapka has two P.O. Boxes on
Newbury Street, under the name of Andrew Schwankoff.

Sharapka advised that he and his group wire transfer
money to the Deutsche Bank (Germany), and from there it usually
ended up in banks in either Moscow or banks in the Baltic
states. When his partners in Kiev would wire transfer money back
to him, they would usually use Wachovia Bank or the Deutsche
bank. The wire transfers were usually over the $10,000 amount.
Sharapka was not aware of the financial reporting when dealing
with the banks, until he was arrested in Atlanta.

Sharapka advised that he and his group also used
Western Union to send money back and forth from the United
States to Kiev and Moscow. Sharapka would usually pick up money
from anywhere between $2,500 and $4,000 per day, from two
different locations, every day for two weeks. Sharapka advised
that most of this was the money sent to him for the purchase of
three SUVs. Sharapka advised that this was done to avoid
reporting requirements and to avoid showing several different
forms of identification.  Sharapka advised that he had around

FD-302a (Rev. 10-6-95)

288A-BS-94613

**COPY**

Continuation of FD-302 of ___OLEKSIY SHARAPKA_____ , On 11/07/04 , Page 4

$17,000 cash in possession when he was arrested. Sharapka also advised that they transfer money through Online Type Money (OTM) service, similar to PAYPAL. This OTM service is used throughout Russia, so that money cannot be traced.

Sharapka was asked what the names of his Russian employers were back in Kiev. Sharapka stated that he only knows one of them called Misha. Sharapka talks to him through ICQ on the internet. Sharapka believes Misha is presently living in Moscow. Misha contacted Sharapka and instructed him to purchase laptops, camera's and other appliance items with fraudulent cards that they use. Sharapka then shiped the items back to Kiev and the Baltic States.

Sharapka was next asked what banks within the Boston area has he used to conduct his fraudulent schemes. Sharapka advised that he has only opened up accounts with Citizen Bank. Sharapka denied having any accounts with Fleet Bank. Sharapka also advised that the easiest banks to commit fraud against are Citizen Bank and Sovereign Bank.

Sharapka advised that Misha is extremely intelligent individual. As an example, Sharapka stated that he uses a system that puts a block on his address; however, Misha IP him via ICQ and told him that he was able to trace his home address to 67 Euston Rd, Brighton, Ma. Misha also told Sharapka that he has a network of individuals in the Chicago area, committing schemes at Chicago area banks. These phishing schemes net approximately $60,000 to $80,000 a day, and sometimes as high as $150,000 a day. These schemes are based on capturing data from bank computers, which conduct several daily dumps of information. To obtain the information, the sixteen digit ATM/credit card number, in conjunction with the cards expiration dates, is used to obtain all the account information, including the PIN numbers. The data is then transferred to a blank card, which is then used to drain the accounts. Most of the victims who are targeted are wealthy and have high daily withdrawal limits. Sharapka stated that the scheme is so easy to perpetrate, that they are thousands of people that are doing it. Sharapka further stated that he has at least 400 people in his ICQ address book, and at least half of them are involved in the "phishing" scheme. Sharapka also stated that at one time the Wells Fargo Bank, used to be an easy target for that type of scheme. However, because they (Wells Fargo) has lowered their withdrawal limit, they no longer are worth the effort.

FD-302a (Rev. 10-6-95)

**COPY**

2BBA-BS-94613

Continuation of FD-302 of ____OLEKSIY SHARAPKA_____ , On 11/07/04 ____, Page __5__

     Sharapka advised that he uses the internet name of
SINUE on the Instant Messenger, ICQ.

     Sharapka was next asked if he had used any of the
fraudulent ATM cards to withdraw money within recent weeks.
Sharapka stated that it was quite possible that he had. Sharapka
also stated that several of his friends, who have returned to
Russia, have left him their ATM Cards, along with PIN numbers,
allowing him to withdraw money from those accounts.

     In conclusion of this interview, Sharapka was asked if
he wanted to add any additional information to his statements.
Sharapka stated the following: Although, he was not aware that
his activity prior to his arrest in Georgia was unlawful, when
he was committing his acts in Boston, he was fully aware that
the acts were illegal. Sharapka then asked SA RINCHIUSO and TFO
KRISHTAL a question regarding cooperation with the authorities.
Sharapka wanted to know, how he could benefit from cooperation
with the investigators. Sharapka was advised that it was up to
him and his attorney to make of those arrangements.

     Oleksiy Sharapka is physically describe as follows:

```
sex                     male
race                    white-non-Hispanic
DOB                     9/29/76
ssn                     unk
hair                    brn
eyes                    hazel
weight                  195lbs
build                   medium
address                 67 Euston Rd., apt 2, Brighton.
Marital status          single
POB                     Kiev, Ukraine
```

# UNITED STATES DISTRICT COURT

DISTRICT OF __MASSACHUSETTS__

In the Matter of the Search of

(Name, address or brief description of person or property to be searched)

COMPUTER, SCANNER, FEDEX PACKAGE, ENVELOPES, PLASTIC CARDS, AND CELLULAR TELEPHONES MORE FULLY DESCRIBED IN ATTACHMENT B

## SEARCH WARRANT

CASE NUMBER: $MJ04 \cdot m \cdot 259 JLA$

TO: __CHRISTOPHER A. GEARY__ and any Authorized Officer of the United States

Affidavit(s) having been made before me by __CHRISTOPHER A. GEARY__ who has reason to
Affiant

believe that ☐ on the person of or ☒ on the premises known as (name, description and/or location)

SEE ATTACHMENT B

in the _____ District of __MASSACHUSETTS__ there is now

concealed a certain person or property, namely (describe the person or property)

SEE ATTACHMENT C

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before ____ 11 | 25 | 04 ____
Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime -- 6:00 A.M. to 10:00 P.M.) (at any time in the day or night as I find reasonable cause has been established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to __MAGISTRATE JUDGE JOYCE LONDON ALEXANDER__

as required by law.                              U.S. Judge or Magistrate Judge

__11/15/04   4:16 P.M.__          at   BOSTON, MA
Date and Time Issued                    City and State

MAGISTRATE JUDGE JOYCE LONDON ALEXANDER

Name and Title of Judicial Officer          Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

## ATTACHMENT B

### DESCRIPTION OF PROPERTY TO BE SEARCHED

A. An HP Pavilion Laptop computer, model ZX5280US, serial number CND4260DCC, taken from the residence of Oleksiy Sharapka, 67 Euston Rd, 2nd floor, Brighton, MA on November 5, 2004.

B. The scanner, model number MSRZ06-3HL, serial number A009524, taken from the residence of Oleksiy Sharapka, 67 Euston Rd, 2nd floor, Brighton, MA on November 5, 2004.

C. Fed Ex package addressed to Alexis Llanos, 1085 Commonwealth Avenue, #169, Boston, MA 02215, from Kinko's 0169, Waterville, Ohio, which was seized from the Mail Boxes Etc. located at 1085 Commonwealth Avenue, #169, Boston, MA 02215.

D. 59 white plastic cards, each with an encodeable magnetic strip, taken from the residence of Oleksiy Sharapka, 67 Euston Rd, 2nd floor, Brighton, MA on November 5, 2004.

E. Five T-mobile cellphones, including 3 Nokia telephones, 1 Samsung telephone and 1 Sony telephone, each of which was taken from the residence of Oleksiy Sharapka, 67 Euston Rd, 2nd floor, Brighton, MA on November 5, 2004.

F. Ten unopened envelopes sent from Netspend Corporation, P.O. Box 42589, Austin, Texas 78704 to the following names: Deniss Bobrovski (3); Andrei Volgin (3); and Aleksei Uskov (4), all of which feel as though they contain a

1

Netspend card, obtained from the Town Line Inn, 735 Broadway, Malden, MA.

G.    One Samsung flip telephone which is currently in the custody of the Nashua

Street jail, amongst the personal possessions of Oleksiy Sharapka, a/k/a Andrew

Schwamkoff.

2

## ATTACHMENT C

## ITEMS TO BE SEIZED

Any and all documents, data, information, or communications, in any form, and any and all software, hardware, or other items, evidencing, or constituting instrumentalities or fruits of, Fraud and Related Activity in connection with Access Devices, in violation of 18, United States Code, Section 1029, including but not limited to the following; the specific items to be seized from each of the search locations or items to be searched (as fully described in Attachment B) are particularly described and set forth as follows:

A        From the HP Pavilion Laptop computer :

Any and all computer log files, stored electronic communications, including e-mail and ICQ messages, e-mail, ICQ, and other address books, internet history files, temporary internet files, internet "favorite" files, word documents, text documents, excel spreadsheets and other files evidencing shipping and delivery addresses and payments, personal information, names and addresses, credit card accounts, numbers and passwords, including encrypted files, as well as software for encoding financial information onto magnetic stripes, typically used on bank and credit cards.

B.        The scanner, model number MSRZ06-3HL

Information stored in memory relating to personal information, card numbers, "PIN" number and other information typically encoded on bank and credit cards, as well as other official identification cards.

1

C.    Fed Ex package and the envelopes

Contents.


D.    59 white plastic cards

Information stored on the magnetic strip relating to personal information, card numbers, "PIN" number and other information typically encoded on bank and credit cards.


E.    6 cellphones

All information contained in memory, including calls made, received and missed, saved messages, whether text or voice, personal stored information, telephone settings, memos, names, addresses and telephone numbers in stored address book, and information in date book.

2

FD-597 (Rev 8-11-94)                                                    Page ___1___ of ___1___

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # _____

On (date) 11/16/2004 .                                    item(s) listed below were:
                                                          ☑ Received From
                                                          ☐ Returned To
                                                          ☐ Released To
                                                          ☐ Seized

(Name) DET. ERIC KRAUSE. , BOSTON P.D.

(Street Address) 1 SCHROEDER PLAZA

(City) BOSTON , MASSACHUSETTS.

Description of Item(s): _____

(1) FEDEX PACKAGE

(2) 2 NOKIA '. | SAMSUNG CELL PHONES

(3) 1 NOKIA '. 1 SONY Cell PHONES

(4) 59 DEBIT CARDS

(5) COMPUTER, EMBOSSER MSRE∅6-3HL

(6) COMPUTER, HP PAVILION ZX5286US
       S/N CND4260DCC

(7) NET SPEND ENVELOPES.

(8) HANDWRITTEN NOTES.

(9) NETSPEND JAMES BIEBER.

Received By: _____  Received From: _____
              (Signature)                                    (Signature)

1

I
1 - 25

UNITED STATES DEPARTMENT OF JUSTICE

OFFICE OF THE UNITED STATES ATTORNEY

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

    VS.                       Case No.

JOHN DOE.

                             Federal Grand Jury
                             U.S. Courthouse
                             1 Courthouse Way
                             Boston, Massachusetts

                             Wednesday
                             October 19, 2005

APPEARANCE:   SETH P. BERMAN
               Assistant U.S. Attorney

ORIGINAL

WITNESS:     CHRISTOPHER A. GEARY

**APEX Reporting**
(617) 426-3077

2

I N D E X

WITNESS                                                        PAGE

Christopher A. Geary

    Examination by Mr. Berman                                    3

EXHIBITS    DESCRIPTION                                        PAGE

No. 1       Photocopy of multiple driver's licenses            16

CHRISTOPHER A. GEARY - 10/19/05                3

1                        P R O C E E D I N G S

2                                                    (1:50 p.m.)

3                    CHRISTOPHER A. GEARY, Sworn

4            EXAMINATION BY MR. BERMAN:

5        Q    Could you start by telling the Grand Jury your

6    name and spelling it for the record?

7        A    My name is Chris Geary, G-e-a-r-y, and I'm a

8    special agent with the FBI in the Boston Division.

9        Q    How long have you been an FBI special agent?

10       A    I've been an FBI special agent for over the last

11   six years, and I've been assigned to the Computer Crime

12   Squad in the Boston Division.

13       Q    For how long?

14       A    Over six years.

15       Q    At some point in the course of your duties, were

16   you involved in an investigation involving a man known as

17   Oleksiy Sharapka?

18       A    Yes.

19       Q    Okay.  Now can you tell the Grand Jury, based on

20   your own investigation and your conversations with others,

21   as well as your review of police reports and other agents

22   and officers involved in this investigation, briefly

23   describe what it was about, that investigation?

24       A    The investigation entailed actually a couple of

25   different aspects.  One was basically fraudulent ATM

*APEX Reporting*
(617) 426-3077

CHRISTOPHER A. GEARY - 10/19/05                    4

1  transactions, made at ATM machines, through fraudulent ATM

2  cards.  The other part was part of a reshipping -- actually

3  a credit card fraud ring where Oleksiy Sharapka was in

4  charge of obtaining mail drops or places where stolen or

5  fraudulently purchased merchandise on the internet can be

6  sent to, so that they can either resell it or reship it back

7  to other destinations outside of the United States.

8           So there was credit card fraud and also ATM debit

9  card fraud.

10      Q    Can you briefly tell the Grand Jury how did this

11  case or this investigation first come to your attention or

12  come to the attention of the authorities, I should say?

13      A    The case initially initiated on the FBI side.  We

14  were looking at fraudulent ATM transactions out of a local

15  bank.  We became alerted to Mr. Sharapka from the Brockton

16  Police Department and a United States Postal Inspection

17  Service investigation that basically arrested Oleksiy

18  Sharapka on receiving stolen property from these fraudulent

19  internet purchases.  And what they ---

20      Q    Can you briefly describe that -- when did that

21  arrest occur?

22      A    That arrest occurred November 5th, 2004.

23      Q    And can you describe sort of what led up to that

24  arrest and what was found?

25      A    Sure.  There was a woman from Massachusetts called

APEX Reporting
(617) 426-3077

1   the U.S. Postal Service Identity Theft Task Force stating
2   that she noticed on her card that a -- I believe it was a
3   computer, some electronic product was purchased on her card
4   fraudulently and that it was being shipped to a particular
5   address in Boston.

6       Q    This woman's name was Deniss Bobrovski; is that
7   right?

8       A    I don't believe that that's the right name.  I
9   think that was the fake name that they had the product
10  shipped to.

11      Q    Oh, okay.

12      A    Yeah.  So the person's true -- the person whose
13  card was used in this purchase called the identify task
14  force, informed them that this computer equipment was being
15  shipped to this address, the identity theft task force then
16  is staked out or did surveillance on that address, noticed
17  an individual came and picked up that product, they followed
18  the individual, stopped him and asked him, you know, where
19  did you get this, who sent you to pick this up?  They
20  advised that they were picking this product up for a Russian
21  male.  They didn't give his true name at that point.  They
22  decided to cooperate with the members of the identity theft
23  task force.

24      Q    By they, you mean the person who was stopped?

25      A    Yes.  The individual who was stopped, agreed to

CHRISTOPHER A. GEARY - 10/19/05                    6

1   cooperate, took a Boston PD Detective along with him when he
2   dropped off the merchandise.  Mr. Sharapka then exchanged,
3   gave him an envelope filled with cash for return of picking
4   up his stolen packages or his packages that were shipped to
5   him from the stolen credit card purchases.

6           And shortly thereafter they, within minutes, a
7   Boston PD Detective and a U.S. Postal Service Investigator
8   approached Mr. Sharapka on the front porch of his residence,
9   advised that they wanted to talk to him.  He said, you know,
10  could we please take this upstairs, and we can speak
11  upstairs.  They proceeded to go upstairs with him.  After
12  reading him his rights and everything like that, he
13  basically laid out that he was part of a reshipping scheme,
14  where he was the middleman accepting the shipments or the --
15  yeah, the shipments of the merchandise that was purchased on
16  these fraudulent transactions.

17      Q    Okay.  I'm going to ask you to pause there.

18          So he said that, as the middleman, he had obtained
19  from someone the identity information which includes the
20  names, dates of birth, mothers' maiden's names, addresses
21  social security cards, credit cards and bank account
22  information of numerous people; is that right?

23      A    Yes, that's correct.

24      Q    And he obtained this information from someone in
25  Russia or somewhere like that?

1        A     Someone believed to be in Russia or other places.

2     He did most of his communication through the internet.

3        Q     Okay.  And that -- what did he say he did with all

4     this credit card and identity information?

5        A     Oh, the majority of what he did was he accepted

6     the packages.  Someone else would place the orders and then

7     they would ship them to the mail drops that he established.

8     Then he would package up the -- he would have either himself

9     or other individuals go pick up these packages and then he

10    would, again, reship them to someone who would then ship

11    them overseas.

12       Q     And where presumably they would be sold or ---

13       A     Sold or -- yes, sold or put on eBay.

14       Q     Okay.  Now what about the bank account numbers?

15    Did he say anything that he did with bank account numbers?

16       A     He advised that he had tried to ---

17       Q     Well, actually, let me rephrase the question more

18    broadly.  Not just what he said.  Based on your

19    investigation, have you learned what happened with the bank

20    account numbers?

21       A     With the bank account numbers, when you typically

22    -- to make an ATM transaction work, you really only need two

23    pieces of information.  You need the account number and the

24    PIN number.  So when the U.S. Postal Service Investigator

25    and the Boston Police Department Detective went up to

1   interview Sharapka in his residence, they found 59 white

2   plastic cards, sort of like this one, which is basically a

3   pass for parking, basically identical, just white plastic

4   with a magnetic strip on the back.

5        Q    Okay.  So it looks like a credit card, except it

6   doesn't have any identifying information or numbers on it,

7   and it just has a magnetic strip on the back?

8        A    That is correct.

9        Q    Okay.

10        A    And if you have the right equipment, you can

11   actually encode the account number and PIN number and other

12   data needed to make an ATM transaction.  And in his

13   possession he had 59 of them, which had 49 -- out of the

14   59 cards, 49 of them contained bank account information and

15   PIN numbers on there.

16        Q    And did he say whether or not he may have

17   attempted to use these bank cards?

18        A    Yeah.  He said that he had attempted and I believe

19   he did not recall whether he had received any moneys from

20   them.

21        Q    Okay.  And based on your investigation, did you

22   learn whether or not anyone else used any of these bank

23   cards to get money?

24        A    Yes.  There were cards where fraudulent ATM

25   transactions had been reported and the banks had reinstated

1   the money back into the victims' accounts.

2        Q    So that was of those 49 cards, some of those had
3   been used?

4        A    Out of those 49, the banks, once an ATM or bank
5   card number has been taken out of circulation, they delete
6   all the data that goes with those cards.  So out of those
7   49, the banks come back and could not provide us any
8   information whether any of those had been used fraudulently.
9   However, we had found over 350 other card numbers that he
10  had on his laptop computer, and out of those 350, we found a
11  few banks that still had information relevant to fraudulent
12  ATM transactions being used, and one in particular had
13  two ATM transactions in the Brighton/Allston area, which was
14  right around where Mr. Sharapka lived.

15       Q    Now, I want to focus on some specifics.  During
16  the course of your investigation, were you able to determine
17  whether or not any shipments were made on or about
18  August 24th, 2004?

19       A    August 24th, 2004?  Yes.  There was a shipment
20  that was sent from dell.com and it was for five digital
21  cameras, and it was sent to an address care of Alexis
22  Llanos, which is an alias that was used by Oleksiy Sharapka.
23  The address was 198 Tremont Street, Suite 101 in Boston.
24  The value of that shipment was approximately $5,000.

25       Q    Now, did you learn during the course of your

CHRISTOPHER A. GEARY - 10/19/05                    10

1   investigation whether or not those digital cameras were

2   billed to somebody other than Mr. Sharapka?

3        A     What I have learned is that Dell, a credit account

4   had been opened at Dell under someone else's name.

5        Q     And that someone has the initials FWS; is that

6   right?

7        A     That's correct.

8        Q     And that -- so that person's social security

9   number and other identity information was used by someone to

10  open up an account there; is that right?

11       A     Dell has not responded back with that information

12  at this point.  What I do know is that that package was

13  delivered and I have that from a printout of the DHL web

14  page that shows that it was delivered to this address that

15  was paid for by Alexis Llanos, the alias, but a license

16  provided showed that it was actually Oleksiy Sharapka, whose

17  picture was on the fake license.

18       Q     Okay.  So take a step back.  Where is that

19  address?

20       A     That address ---

21       Q     What is it?

22       A     It's a Mail Boxes Etc.

23       Q     Okay.  And so despite having a suite number, it's

24  really a mailbox, right?

25       A     That is correct.  Yes.

CHRISTOPHER A. GEARY - 10/19/05                  11

1     Q     And you were able at some point to obtain from

2   Mail Boxes Etc, the contract that was signed to open that

3   address?

4     A     Yes.  That is correct.

5     Q     Okay.  And you were saying that contract had a

6   license that purported to be Alexi -- Alexis Llanos, but the

7   license -- a photocopy of that license, but the person whose

8   picture was on that license was Oleksiy Sharapka?

9     A     That is correct.

10    Q     Okay.  Do you know whether or not Alexis Llanos'

11  license was also found in Sharapka's house?

12    A     Yes.  There was a license that was found that had

13  Alexis Llanos and then had Oleksiy Sharapka's picture on it.

14    Q     So that's the actual license, not just a photocopy

15  that was found in Sharapka's house around the time he was

16  arrested?

17    A     Yes.  It was a fake license.

18    Q     Right.  Okay.  Now on October 18th, 2004, was

19  there a package that was sent on or about that date?

20    A     Yes, there was.

21    Q     Oh, just to clarify.  On the August 24th, that was

22  shipped on Airborne Express; is that right, the previous

23  package we were talking about?

24    A     Yes.  Airborne Express, DHL, they're the actual

25  same company.


APEX Reporting
(617) 426-3077

1    Q    Yeah.  So, now on October 18th, 2004, there was

2  also a package shipped?

3    A    Yes.  There was a package from neimanmarcus.com

4  that was shipped.

5    Q    And that was purchased using the credit card

6  information of someone with the initials AD; is that right?

7    A    That is correct.  Yes.

8    Q    And what was shipped, do you know?

9    A    It was multiple -- there was actually two,

10  two shipments to that address, but on this particular date,

11  two shearling jackets and pair of black leather boots,

12  totaling $2,800, approximately, were sent to an address in

13  Allston, Massachusetts.

14    Q    Okay.  And what's that address?

15    A    8 Barrows Street.

16    Q    And what's at that address?

17    A    Actually, that address, I believe, is an apartment

18  building.

19    Q    How do you know or have you in the course of your

20  investigation been able to connect that address to Oleksiy

21  Sharapka?

22    A    Oh -- yeah.

23    Q    Or that shipment?

24    A    That shipment.  Let's see.

25         (Pause.)

1      A      I know that on his computer he had the person's

2   initials AD.  He had their personal information on his

3   laptop there.  And, also, I'm trying to find a copy of an

4   order or a document that showed that -- that showed that the

5   order -- he was expecting that order.

6      Q      In other words, there was an e-mail on his

7   computer or some other document showing that he was

8   expecting to receive this item?

9      A      Yes.  Yes.

10     Q      Okay.  Now on October 22nd of 2004, there was

11  another shipment on that day; is that right?

12     A      Yes.

13     Q      And what was that?

14     A      That was amazon.com and that was a camcorder, a

15  camcorder accessory kit, and Canon mini DVD camcorder, and

16  that totaled approximately $480.

17     Q      Okay.  And that was shipped via UPS; is that

18  right?

19     A      Yes.  That's correct

20     Q      And where was that shipped to?

21     A      That was shipped to Alexis Llanos,

22  1085 Commonwealth Avenue, Suite 169, in Boston,

23  Massachusetts.

24     Q      Is that another Mail Boxes Etc?

25     A      That is.


*APEX Reporting*
(617) 426-3077

1    Q    And were you able to obtain from that Mail Boxes

2    Etc the information of who opened that mailbox?

3    A    And, again, it was Alexis Llanos with a fake ID,

4    bearing his picture.

5    Q    Okay.  And that was -- that item was billed to

6    someone with the initials WM; is that right?

7    A    That's correct.  An amazon.com representative

8    advised that -- actually, an American Express investigator

9    advised that the purchase on that card had been refunded

10   back to amazon.com ---

11   Q    Okay.

12   A    --- as a result of the fraud.

13   Q    Okay.  Now what about on November 2nd, 2004, was

14   there a purchase on that day?

15   A    Yes.  There was a purchase from hbshopping.com for

16   a PhotoSmart digital camera and it was billed to a person

17   with the initials R. Brode in Massachusetts.  And, again,

18   this shipment was shipped to Alexis Llanos at 276 Washington

19   Street, No. 194, in Boston, Massachusetts.

20   Q    Okay.  That was shipped via FedEx?

21   A    Yes.  That's correct.

22   Q    And were you able -- is that a Mail Boxes Etc?

23   A    That's correct.  Yes.  And, again, he used a

24   license bearing his picture to open that Mail Boxes Etc.

25   Q    Okay.  And finally, also, on November 4th, 2004,

*APEX Reporting*
(617) 426-3077

1    was there a shipment on that day?

2         A    Yes.

3         Q    And what was that?

4         A    That was shipped via UPS from amazon.com and it

5    was a Sony mini DVD Camcorder, and it was billed to a person

6    with the initials GLS.

7         Q    Okay.  And where was that shipped to?

8         A    Again, to Alexis Llanos at 276 Washington Street,

9    No. 194, in Boston, Massachusetts.

10        Q    That's the same Mail Boxes Etc as in the

11   previous ---

12        A    That's correct.  Yes.

13        Q    Okay.  Now, on November 5th, 2004, you had said

14   that the Boston Police and the Postal Inspection Service and

15   others on or about that date conducted a search of

16   Mr. Sharapka's residence; is that right?

17        A    That is correct.  Yes.

18        Q    Okay.  And during the course of that search, did

19   they turn up any false identification documents?

20        A    Yes, they did.  They found numerous fake driver's

21   licenses and credit cards issued in these fake names that

22   were used on the driver's licenses.

23        Q    When you say fake driver's licenses, what do you

24   mean?

25        A    Driver's licenses that showed pictures of Oleksiy

CHRISTOPHER A. GEARY - 10/19/05                16

1  Sharapka under different names.

2      Q    Okay.  Were there more than five of them?

3      A    Yes, there were.

4      Q    How many, do you know?

5      A    I believe there were over twelve total, near

6  fifteen.  I have copies of some of them.

7      Q    Okay.  We can show some of them to the Grand

8  Jurors.

9              (Pause.)

10             MR. BERMAN:  Okay, I'll have this marked as Grand

11 Jury Exhibit No. 1.

12                        (Grand Jury Exhibit No. 1 marked.)

13     Q    BY MR. BERMAN:  Just as an example I'm showing you

14 Grand Jury Exhibit No. 1.  Can you state what is this?

15     A    This is a photocopy of multiple driver's licenses

16 that were found in Oleksiy Sharapka's apartment.

17     Q    And not all -- there are on that page ---

18     A    Twelve.

19     Q    --- twelve driver's licenses.  Not all those

20 licenses have his picture on it, right?

21     A    That is correct.

22     Q    But some of them do?

23     A    Some of them do, yes.

24     Q    Okay.  And none of them are in the name of Oleksiy

25 Sharapka, right?

1      A      None of them are under that name.

2      Q      Okay.  The ones that don't have his picture on

3   them have somebody else's picture.  Have you been able to

4   determine whether or not those are real licenses?

5      A      No, we have not.

6      Q      Okay.  Now on that same date, November 5th, 2004,

7   and on subsequent days, as we said, there was a search of

8   items in his house and his computer.  During that search, do

9   you know whether or not any access devices, meaning credit

10  card numbers, bank account numbers, social security numbers,

11  particularly let's say credit cards and bank account

12  numbers, were any of those found during the course of that

13  search?

14     A      Yes.  There were numerous bank account numbers,

15  numerous credit card information, along with personal

16  identification information, including on some individuals it

17  would have date of birth, social security account number,

18  mother's maiden name and address for these individuals.

19     Q      Okay.  Did you find, among other things, during

20  the course of these searches, the credit reports of

21  individuals?

22     A      Yes.  I believe we found fifteen credit reports of

23  other individuals, yes.

24     Q      And at least some of these access devices and

25  identities, were they used for the purpose of committing a

CHRISTOPHER A. GEARY - 10/19/05                    18

1    fraud, based on your investigation?

2        A    Yes.

3        Q    And the fraud was the mail fraud that we had

4    talked about earlier?

5        A    Yes.  There was numerous shipments to different

6    addresses that Oleksiy Sharapka was, I'll say, in charge of.

7        Q    Okay.  Now did you find any equipment used to make

8    access devices during the course of these searched?

9        A    Yes.  When the U.S. Postal Service Investigator

10   and the Boston PD Detective went into his residence with

11   Mr. Sharapka, after Mr. Sharapka signed a consent to search,

12   they found numerous boxes of this type of merchandise,

13   electronic equipment, clothing and things like that, but

14   they also found a laptop computer that also had a device

15   connected to it.  The device is a magnetic card read writer

16   and if connected to your computer, along with the

17   appropriate software, which after a computer forensic exam

18   was done on the laptop, identified that the software, to be

19   able to read and write onto these magnetic striped cards was

20   all present, so that, you know, if he had a blank card,

21   which he did, or if he had the white plastic cards with the

22   magnetic stripes on the back, he can read them and he can

23   also write to them.

24       Q    Okay.  Now I should clarify.  I've asked whether

25   you found several things several times, but actually you

CHRISTOPHER A. GEARY - 10/19/05                    19

1   weren't present, right?

2        A     I was not present on the search.

3        Q     You know this from the other officers who were

4   present, right?

5        A     That's correct.  Yes.

6        Q     Sorry, it was my misstatement.

7              Now during the course of this search, did you also

8   find identity information, specifically regarding name and

9   social security number, of someone by the name of Alexis

10  Llanos?

11       A     Yes.  Yes, we found a file on his computer that

12  showed basically all the identifying information for Alexis

13  Llanos, including his mother's maiden name.

14       Q     Okay.  And you also found a license you've already

15  said that had Alexis Llanos' information, some information

16  about Alexis Llanos and Alexis Llanos' picture; is that

17  right?

18       A     That is correct.  Yes.

19       Q     Did you find any such thing or you or the other

20  law enforcement officers involved relating to Andrew

21  Schwamkoff?

22       A     Yes.  The same file also contained information for

23  Andrew J. -- it was actually Schwankoff, as opposed to m,

24  S-c-h-w-a-n-k-o-f-f.  And, again, this included name, social

25  security account number, driver's license number, driver's

*APEX Reporting*
(617) 426-3077

1 │ license state, mother's maiden name, address, daytime and

2 │ nighttime phone numbers.

3 │    Q    Okay.  In addition to that, was any merchandise

4 │ found in the house?

5 │    A    Yes.  Numerous boxes of laptops and computers were

6 │ found in the residence and other investigators have

7 │ contacted some of the on-line merchants and determined that

8 │ these were fraudulent purchases.

9 │         ·    GRAND JUROR:  Had the original shipment labels?

10 │              THE WITNESS:  Yes.

11 │    Q    BY MR. BERMAN:  Were they opened or unopened?

12 │    A    Both.  Some were open, some weren't.  Yeah, so

13 │ they were both open and unopen.

14 │    Q    Okay.  In total, have you been able to determine

15 │ whether or not -- as a result of the merchandise you've been

16 │ able to tie to fraudulent purchases or sales by Mr. Sharapka

17 │ totaled more than $400,000?

18 │    A    If you count everything involved -- looking here,

19 │ and this is only a partial count of everything.  The

20 │ inventory that was taken from his residence on that day,

21 │ we've calculated to be approximately $88,000.  A partial

22 │ count of the transactions that he had records of on his

23 │ laptop computer through different text files, again, this is

24 │ partial approach or approximately $280,000.  I have it at

25 │ 279,000 and a couple of hundred dollars at this point, which

1  is a little under the 400, but there's other information on

2  there, including credit lines of individuals, and the credit

3  lines totaled $64,000, as well.  And there's a bunch of

4  Sears or a group of Sears MasterCards that -- information

5  that was found in his possession, and MasterCard reported

6  back to Boston PD that they had stopped or at least they're

7  counting it as stopping over $100,000 in fraud because of

8  these ID -- these -- credit card information was recovered.

9       Q    So in total there is at least $400,000 worth of

10  fraud that you can trace to Mr. Sharapka?

11       A    That's correct.

12       Q    Okay.

13            MR. BERMAN:  I have no further questions for this

14  witness at this time.

15            Are there any from the Grand Jurors?

16            GRAND JUROR:  Why would he consent to have you

17  search?  You didn't have a search warrant.

18            MR. BERMAN:  Let me stop with that question for a

19  moment.

20            I'm not sure that this witness can testify about

21  why.  He wasn't present.

22            GRAND JUROR:  Right.

23            MR. BERMAN:  And I'm not sure he can testify about

24  why Mr. Sharapka would or wouldn't do something.

25            GRAND JUROR:  Okay.

```
 1              MR. BERMAN:  Okay.

 2              GRAND JUROR:  Fine.

 3              THE WITNESS:  The one part that we can add, that

 4    during the interview on that day, he did basically confess

 5    to that and say that he was the middleman in this fraud

 6    ring.  And then an agent and another task force officer from

 7    our office interviewed him, I believe it was two days later,

 8    and again he confessed that he was the middleman in this

 9    sort of fraud ring.

10              GRAND JUROR:  If he's the middleman, have you been

11    able to identify anyone above him?

12              THE WITNESS:  On this here?

13              MR. BERMAN:  Can you answer that?

14              THE WITNESS:  Yeah, I can answer that.

15              No, he's not been cooperative in assisting us.

16              (Laughter.)

17              MR. BERMAN:  That wasn't the answer.

18              (Laughter.)

19              MR. BERMAN:  Whether he's cooperative or not,

20    obviously, is not something you should take into account

21    when determining whether or not you think he's guilty or

22    whether there's probable cause here.

23         Q    BY MR. BERMAN:  The individuals that we think may

24    have been involved, do you have any idea what country

25    they're in?
```

CHRISTOPHER A. GEARY - 10/19/05                 23

1      A    Yeah.   Individuals who are involved, more than

2   likely, are overseas in Russia or other Eastern European

3   Countries.

4           GRAND JUROR:  Have you been able to track any

5   shipments out of the country, not necessarily who received

6   them, because you don't know who that is, but in shipments?

7           THE WITNESS:   That's still being worked on.

8           GRAND JUROR:   Okay.  Fair enough.

9           GRAND JUROR:   What percentage of the transactions

10  did he receive?

11          THE WITNESS:   It varied, but I've seen some notes

12  that showed 25 percent.

13          MR. BERMAN:  Okay.

14          GRAND JUROR:  Now those cards, are those easily

15  available to any Joe?  Those white cards you showed for

16  parking, I mean, all you need is a device.  I mean, are you

17  able to track down where he's getting his supplies?

18          THE WITNESS:  Those -- the cards are actually -- I

19  mean, anybody can buy the cards.

20          GRAND JUROR:  That's what I wondered.

21          THE WITNESS:  Yeah.  They are free -- I mean,

22  anyone can buy them.  They're not illegal, but they're

23  illegal to have if you have someone else's account number

24  and PIN number with them.

25          GRAND JUROR:  So you can get those right out of

CHRISTOPHER A. GEARY - 10/19/05                24

1  | OfficeMax or whatever?

2  |          THE WITNESS:  I'm not sure about OfficeMax, but I

3  | know that you can buy them, you know, pretty easily.

4  |          GRAND JUROR:  So you're not going to tell us how

5  | to buy them, huh?

6  |          THE WITNESS:  Yeah.

7  |          (Laughter.)

8  |          MR. BERMAN:  You can try Googling it.

9  |          GRAND JUROR:  There you go.

10 |          (Laughter.)

11 |          MR. BERMAN:  Any other questions?

12 |          No?  Okay.  Thank you.

13 |          GRAND JUROR:  Thank you.

14 |          THE WITNESS:  Thank you.

15 |          (Whereupon, the witness was excused.)

16 |          (Whereupon, at 2:20 p.m., October 19th, 2005, the

17 | above matter was concluded.)

*APEX Reporting*
(617) 426-3077

25

## CERTIFICATE OF REPORTER

This is to certify that the attached proceeding

before: ___ A FEDERAL GRAND JURY _____

in the Matter of:


UNITED STATES OF AMERICA

VS.

JOHN DOE



Place: Boston, Massachusetts

Date:  October 19, 2005


were held as herein appears, and that this is the original

transcript thereof.



OFFICIAL REPORTER (Signature)
Diana Strzemienski


*APEX Reporting*
(617) 426-3077