UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 05-cr-10004 PBS |
| | ) | |
| OLEKSIY SHARAPKA | ) | |
|     Defendant. | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENTAL
MOTION TO DISMISS THE SUPERCEDING INDICTMENT**

At the request of the Court, Defendant OLEKSIY SHARAPKA submitted a Supplemental Memorandum in Support of his Motion to Dismiss the Superseding Indictment, in which he purports to provide specific examples of information he claimed was provided by him during the proffer sessions that was later used improperly by the Government. Defendant's Supplemental Memorandum is both legally and factually without merit. Indeed, defendant's attempt in his latest filing to be more specific about what proffer information he alleges was used improperly by the Government only underlines the absolute emptiness of his claim. Defendant's motion should be denied.

    I.    <u>Defendant's Claim is Legally Barred by the Proffer Agreement:</u>

In the Government's first response to defendant's motion, filed on December 22, 2005, the Government argued that the proffer agreement's second paragraph, which allows the Government to use any evidence whether directly or indirectly derived from the proffer against the defendant, and which explicitly bars a <u>Katigar</u> hearing, specifically excluded the defendant's claim. Defendant responds to this argument by claiming an alleged contradiction between the first and second paragraphs of the agreement, because the first paragraph promises that the

1

government will not directly use any statements or "other information" provided by the defendant against him (except in cross-examination). The defendant asserts – without citing a single case or other source – that as a result of this apparent contradiction, the contract is "ambiguous" and therefore should be construed against the drafter of the agreement – the Government.

However, this principle of contract interpretation simply does not apply in this situation. Ambiguous contract terms are in some circumstances construed against the drafter. However, the alleged contradiction between the first and second paragraphs of the agreement is not the type of ambiguity which that rule is intended to correct. Instead, an ambiguous contract term is one in which a term or word is subject to multiple interpretations, and nothing in the contract clearly explains how that term is applied. See Restatement of Contracts (Second) § 206. The alleged contradiction in the proffer agreement is not an ambiguity of this sort. At most, it is a situation in which two different paragraphs of the agreement may be read in a way that contradicts each other. In such situations, a different set of contract interpretation principles apply.

The Restatement of Contracts (Second) § 203 states, in pertinent part, as follows:

In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable:
(a) an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or of no effect; ...
(c) specific terms and exact terms are given greater weight than general language."

Under these rules of contract interpretation, the explicit exception in the second paragraph of the proffer agreement takes precedence over the broader but more general language of the first paragraph. As the First Circuit has held:

>A common principle of contract construction is that a specific term will control over a conflicting general term. See Restatement (Second) of Contracts § 203(c) (1981). Similarly, it is only logical that a unequivocal term will control over a conflicting ambiguous term.

Newharbor Parterns, Inc. v. F. D. Rich Co., 961 F.2d 294 (1st Cir. 1992). Here, the second paragraph of the proffer agreement contains an unequivocal term excluding from the protections of the agreement any "evidence directly or indirectly derived from the proffer." The agreement further specifically bars the defendant from seeking a Kastigar hearing. Under the principle established in Newharbor Partners, this unequivocal term controls over the protections given to the more general "other information" in the first paragraph of the agreement. Calling this potential contradiction an "ambiguity" does not alter the analysis, as the Newharbor court made clear, because "a unequivocal term will control over a conflicting ambiguous term." Id. Consequently, the defendant's claim is legally barred, and should be dismissed.

    II.    Defendant's Claim is Factually Without Merit:

Even were the defendant's claim not legally barred, it is factually unfounded. Defendant Supplemental Memorandum attempts to tie the claimed misuse of proffered information to three counts of the Superseding Indictment. Specifically, defendant claims that Count Seven, which charges him with possession with intent to defraud fifteen or more access devices in violation of 18 U.S.C. § 1029(a)(3), is based on his proffered testimony because, though the Government had possession prior to the proffer of the 59 white plastic cards that constitute counterfeit credit cards and/or ATM cards, the numbers on the cards would not have been identifiable as potential accounts but for the defendant's proffered explanation. This is demonstrably false. Defendant also claims that the Counts Nine and Ten, both of which charge him with aggravated identity theft in violation of 18 U.S.C. § 1028A, are based on proffered information because, though the

Government knew prior to the proffer that the defendant had fraudulently used the two identities in the manner charged in the indictment, the Government would not have been able to prove that the stolen identities were of real individuals (a necessary element of the crime) unless the defendant had shown the Government where on his computer details regarding the social security numbers and addresses of the identity theft victims could be found. This too is unquestionably false. Each of these claims is purely speculative, factually wrong, and unsupported by the defendant's affidavit.

    A.    <u>Information Related to Count Seven</u>:

Defendant asserts that the Government would not have identified that the 59 white plastic cards contained access device information if the defendant had not told the government how to obtain this information during the proffer. This is simply absurd. The fact that the white plastic cards contained credit card and bank account numbers was known to the Government long before the first proffer session. Indeed, the Government first obtained a list of bank account numbers from these cards on November 29, 2004, and obtained a more detailed list on January 11, 2005, well before the proffer agreement was signed on January 31, 2005. <u>See</u> Affidavit of Christopher Geary, Paragraphs 3-5.

The ultimate proof of the absurdity of defendant's claim that the proffer was a necessary prerequisite for the Government to identify the 59 white plastic cards as access devices is the fact that on January 6, 2005, the defendant was charged with this exact same count in the original Indictment filed in this case. Indeed, it was the sole count of that Indictment. Moreover, the defendant himself told the FBI in November 2004 that he may have used the "fraudulent ATM cards" (a reference to the 59 white plastic cards) to withdraw money from area banks in the

4

weeks before his arrest.  See Government's Opposition to the Defendant's Sealed Motion to Dismiss the Superseding Indictment, Attachment 6, Page 5.  Defendant's attempt to make a reference to the white plastic cards in a proffer session into a breach by the Government of the proffer agreement is ridiculous.

      B.      Information Related to Counts Nine and Ten:

Defendant also claims that the aggravated identity theft charges resulted from information gained in the proffer agreement.  This claim is absurd.  Defendant (falsely) told the police officers and federal agents that his name was Andrew Schwankoff when they arrested him on November 5, 2004.  At that time, he possessed a counterfeit drivers license in that name.  He also possessed a counterfeit driver's license in the name of Alexis Llanos.  SHARAPKA admitted to the FBI in November 2004 that he had used both names to commit fraud.  See Government's Opposition to the Defendant's Sealed Motion to Dismiss the Superseding Indictment, Attachment 6.  Nevertheless, defendant now speculates that if he had not told the Government sometime after his proffer agreement was signed that social security and contact information for these two individuals could be found on his computer, the Government would have been unable to prove that Llanos and Schwankoff were real people, and thus would have been unable to prosecute SHARAPKA for aggravated identity theft.  Sadly for the defendant, this speculation is completely contradicted by the evidence.

The Government completed its forensic examination of SHARAPKA's computer on December 8, 2004.  At that time, over a month before the proffer agreement was signed, the Government found references to both Llanos and Schwankoff on the computer, including their addresses and social security numbers.  See Affidavit of Christopher Geary, Paragraph 6.

Perhaps more to the point, however, even this was not necessary. Among the items recovered from the defendant's apartment on November 5, 2004, was a one page computer printout containing both Llanos' and Schwankoff's names, dates of birth, social security numbers, addresses, telephone numbers, and mothers' maiden names. See Affidavit of Christopher Geary, Paragraph 7. Obviously, the Government did not need SHARAPKA's proffer to obtain information that it already possessed.

## CONCLUSION

SHARAPKA's vague assertions about the information he provided and its connection to his subsequent prosecution do not withstand even a moment's scrutiny. His claim is legally barred and factually groundless. The Court should deny the defendant's Motion to Dismiss the Superseding Indictment.

Respectfully Submitted,

MICHAEL J. SULLIVAN
United States Attorney
By:

/s/ Seth P. Berman
SETH P. BERMAN
Assistant U.S. Attorney
(617) 748-3385

January 20, 2006

# AFFIDAVIT

I, Christopher Geary, hereby depose and state as follows:

1.     I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed for six years. I am currently assigned to the Boston Office of the FBI. My duties include investigating computer system intrusions, intellectual property rights violations, and Internet fraud.

2.     Since November 2004, I have been involved in the investigation and prosecution of Oleksiy SHARAPKA.

3.     I first learned about the existence of over 50 white plastic cards with magnetic strips in November 2004. From the very beginning of this investigation, I and the other law enforcement officers involved in this investigation suspected that these white plastic cards contained credit card or bank card information.

4.     I first received information about the specific account numbers on these cards on November 29, 2004 from Dean Tramontana, a United States Secret Service Agent also working on this investigation. On that day, I received a list of the credit card numbers and/or bank account numbers contained on these cards.

5.     On January 11, 2005, I received an updated list from Agent Tramontana providing me with information concerning the issuing bank of each of the credit card and/or bank account numbers contained on the white plastic cards.

6.     On December 10, 2004, I received from Edward Bradstreet, another United States Secret Service Agent working on this investigation, a copy of the computer forensics report completed on December 8, 2004, and a copy of the computer software taken from the defendant's computer. Included in this software are numerous documents

with references to Andrew Schwankoff and Alexis Llanos, including their social security numbers, dates of birth, and other identifying information.

7. During the course of this investigation, I have also had the opportunity to view the documents and other evidence that was seized by the Boston Police Department and Postal Inspection Agents during the search of SHARAPKA's apartment on November 5, 2005. Among these documents was a one page computer printout of information concerning Alexis Llanos and Andrew Schwankoff, including their social security numbers, dates of birth, mothers' maiden names, addresses and telephone numbers.

8. I was also present for each of SHARAPKA's proffer sessions. The first of these was held on January 31, 2005.

CHRISTOPHER GEARY
Special Agent, F.B.I.