UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   Criminal No.05-10004-PBS |
| | ) |
| OLEKSIY SHARAPKA | ) |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States, by and through its attorneys, United States Attorney Michael J. Sullivan and Assistant United States Attorney Seth P. Berman, submits this memorandum to assist the court at sentencing.  The government respectfully requests that this Court sentence the defendant to a 234 month period of incarceration, as well as a fine within the guideline range, a five year period of supervised release, a $100 special assessment, and restitution in the amount of $446,865.

As discussed in more detail below, the government believes that the defendant's guideline range is 234 to 286 months, unless the Court denies the defendant any points for acceptance of responsibility, in which case his guideline range is 286 to 351 months.

Defendant, by contrast, minimizes his role.  He claims he is responsible for far less loss than is in fact the case, and claims without basis that several of the enhancements are legally inapplicable.  Defendant thus claims that his guideline range is 39 to 48 months.  This calculation is ridiculous.

Defendant's conduct was wide ranging, persistent, and extremely costly.  He conducted a complex fraud scheme in the Northern District of Georgia , got arrested, pretended to cooperate so he could be released from prison, promptly cut his electronic monitoring bracelet, fled from the Northern District of Georgia, assumed a new identity, moved to Boston, and recreated his

fraud scheme here. In the process he defrauded tens of banks out of over $1,000,000, stole the identity information of well over twenty individuals, and reshipped hundreds of thousands of dollars of stolen merchandise overseas. As a result of defendant's contemptuous behavior and extensive fraud, he deserves a very long period of incarceration as recommended by the guidelines.

A.   **Background:**

Defendant pled guilty to a far reaching scheme to use stolen credit card and identity information to obtain fraudulently purchased goods, which he used himself or reshipped to others. Defendant was a major player in this scheme. He employed people to pick up his fraudulently obtained packages. He had in his possession numerous identity fraud kits containing items such as bank cards, credit cards, Netspend cards, and pieces of paper which included bank account information, pin numbers, and credit limits. He also possessed well over twenty counterfeit driver's licenses with the names and identity information of real people and the photographs of himself or others working with him. He had 19 credit cards in other people's names in his apartment, as well as hundreds of additional credit card numbers on his computer. He had thousands of dollars in cash in his apartment, as well as tens of thousands of dollars of fraudulently obtained merchandise.

Moreover, defendant's Boston scheme was a relocated and reconstituted scheme that he had begun months early in Atlanta. When defendant was arrested in Atlanta by federal authorities, he was found in possession of 60 stolen credit card numbers, 76 blank but reprogrammed credit cards containing additional stolen credit card numbers, as well as fraudulent driver's licenses, identity fraud kits, and dozens of additional credit card numbers on his

computer. Defendant was released from pretrial detention in Atlanta only after he promised to assist the authorities. However, instead of assisting the authorities, he removed his electronic monitoring bracelet, fled Atlanta, and began his fraud scheme again in Boston.

After waiting less than one week before the scheduled trial date in this matter, defendant pled guilty to six counts of mail fraud, in violation of 18 U.S.C. § 1341, one count of identity fraud in violation of 18 U.S.C. § 1028(a)(3), two counts of access device fraud in violation of 18 U.S.C. § 1029(a)(3), one count of possession of device making equipment in violation of 18 U.S.C. § 1029(a)(4), two counts of aggravated identity theft in violation of 18 U.S.C. § 1028A, and one count of obstruction of justice in violation of 18 U.S.C. § 1503.

Defendant now seeks to convince the Court that he deserves a sentence far lower than that recommended by the guidelines. Even now, after he has pled guilty, defendant tries to minimize his role, and claims that he is responsible for far less loss than is in fact the case. He even asks this Court to apply a minimal role adjustment, despite his orchestration of this fraud in two jurisdiction, and its continuation after his arrest and flight from his first federal case. None of defendant's claims have any merit. As the government will show at the sentencing hearing, defendant is responsible for over $1,000,000 in intended loss. Defendant's assertion that he is only responsible for "about $60,000" of loss calls into question the sincerity and completeness of his acceptance of responsibility for his actions in this matter.

**B.     Guideline Calculation:**

1.     <u>Base Offense Level, 7 Points</u>:

The parties agree that pursuant to U.S.S.G. § 2B1.1, the base offense level is 7.

2.      Intended Loss Amount, 16 Point Enhancement:

At the sentencing hearing, the government will prove that defendant is responsible for intended losses of over $1,000,000, and thus ought to receive a 16 level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(I). As will be explained in more detail at the sentencing hearing, this calculation is based on the following categories of loss:[1]

| | |
|---|---|
| 40 Stolen Credit Card Numbers From Defendant's Atlanta Computer at $500 per Access Device (See U.S.S.G. 2B1.1 Note 3(F)(i)) | $20,000 |
| Value of Fraudulently Obtained Property Found in Defendant's Possession in Atlanta | $24,946 |
| Actual and Intended Fraud Committed Using American Express Cards by the Defendant in Atlanta | $312,241 |
| 120 Credit Card Number Encoded on Cards Found in Defendant's Possession in Atlanta at $500 per Access Device (See U.S.S.G. 2B1.1 Note 3(F)(i)) | $60,000 |
| Value of Fraudulently Obtained Property Found in Defendant's Possession in Boston | $88,716.13 |
| 468 Stolen Credit Card Numbers From Defendant's Boston Computer at $500 per Access Device (See U.S.S.G. 2B1.1 Note 3(F)(i)) | $234,000 |
| Value of Credit Limits for Credit Card Numbers found on Defendant's Boston Computer with Known Credit Limits (See United States v. Alli, 444 F.3d 34, 37-39 (1st Cir. 2006)) | $64,184 |
| Value of Fraudulent Property Whose Orders are Reflected on Defendant's Computer | $278,714.20 |
| **TOTAL** | $1,082,801 |

As the government will prove at the sentencing hearing, each of the credit card numbers

---

[1] Each of these categories has been reviewed so as to eliminate any known overlap of any specific item found in one category with an item found in another. In other words, the 40 credit card numbers found on defendant's computer in Atlanta are different from the 120 credit card numbers encoded on cards found in his possession in Atlanta. Similarly, the government does not know of any overlap between the access device numbers found on the defendant's computer in Atlanta and the access device numbers found on his computer in Boston.

4

found on defendant's computer and in his apartment can be linked to him through the items found physically in his possession, other items saved in the same data files, or through other means. Under the guidelines, the intended loss for credit card and bank account numbers (so called "access devices") is calculated based on the larger of $500 per card, the actual loss on each card, or the credit limit. See U.S.S.G. 2B1.1 Note 3(F)(i) ("In a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device and shall not be less than $500 per access device."). See also United States v. Alli, 444 F.3d 34, 37-39 (1st Cir. 2006) (district court may calculate intended loss by adding the credit limits of stolen credit cards); United States v. Lin, 410 F.3d 1187, 1191-92 (10th Cir. 2005) (district court may aggregate credit limits of all counterfeit or fraudulent credit cards in defendant's possession to calculate amount of loss for sentencing purposes, absent evidence of a lack of intent to use maximum); United States v. Manoocher Nisrati-Shamloo, 255 F.3d 1290, 1290-91 (11th Cir. 2001) (district court may calculate intended loss as combined maximum credit limits of stolen cards, especially where defendant presents no evidence that he did not intent to utilize maximum credit limit); and United States v. Sowels, 998 F.2d 249 (5th Cir. 1993) (district court did not clearly err in determining that loss equaled the combined credit limits of stolen credit cards), *cert. denied*, 510 U.S. 1121 (1994).

Defendant asks the Court to give these access devices no value. He claims that these access devices were not used to commit fraud by him, but were saved on his computer so that he could track the fraud done by others.[2] The government will demonstrate at the sentencing

---

[2] This claim belies defendant's assertion that he was merely a foot soldier in someone else's fraud scheme, and is therefore entitled to a minimal role adjustment.

5

hearing that this claim is false. However, even without a hearing, defendant's assertion that no access device should be attributed to him cannot withstand even minimal scrutiny. Defendant completely ignores the fact that he was found in physical possession of 169 stolen credit cards or plastic cards with reprogrammed access device numbers on them. These access devices alone ought to be valued at $84,500 (169 times $500), even assuming, for the sake of argument, that the access devices on defendant's computer were somehow not within his intentional possession. Simply put, defendant's attempt to explain away his possession of hundreds of access devices is contradicted by the evidence.

    3.    <u>Number of Victims, 2 Point Enhancement</u>:

Defendant claims that there should be no enhancement for the number of victims, because "only four credit card companies suffered actual loss" as a result of defendant's conduct. It is entirely unclear from what facts defendant draws this conclusion. In fact, "credit card companies" are not the correct unit of measure for determining the number of victims. The entity that suffers direct financial loss after the fraudulent use of a credit card is the issuing bank, not the credit card company. (In other words, if Citibank issues a Visa card and fraud is committed on that card, Citibank, not Visa, sustains a loss. Visa is merely a processing company; it is not at risk in any transaction). Taking into account solely the credit cards found in defendant's apartment in Atlanta,[3] over ten banks and other card issuing entities were victims of defendant's conduct, including Advanta Bank Corp., American Express Cards, American Savings Bank, FSB, Bank of America N.A., Citibank, N.A., Fifth Third Bank, First Resource Federal Credit

---

[3] This does not include any of the credit cards found on defendant's Atlanta computer, only those found printed or encoded on plastics cards physically in his possession.

Union, Greenpoint Bank, Home Federal Savings & Loan Association, Household Bank, JPMorgan Chase Bank N.A., MBNA America Bank, N.A., Navy Federal Credit Union, Pulse EFT Association, TCF National Bank, United Fidelity Bank, F.S.B., USAA Savings Bank, Wachovia Bank, and Washington Mutual Bank, F.A.  Thus, even if none of the identity fraud victims themselves are counted as "victims," and none of the issuing banks for the credit cards found on defendant's computer are "victims," defendant nevertheless victimized more than ten entities.  Consequently, he is subject to a 2 level increase pursuant to 2B1.1(b)(2)(A).

      4.      <u>Business of Receiving and Selling Stolen Property, 2 Point Enhancement</u>:

Defendant pled guilty to a scheme to defraud that consisted of receiving stolen property and selling and/or reshipping it.  Thus, there is no dispute that the two point enhancement for being in the business of receiving stolen property pursuant to U.S.S.G. § 2B1.1(b)(3) applies.

      5.      <u>Relocation of Scheme, 2 Point Enhancement</u>:

Defendant pled guilty to obstructing justice in Atlanta by fleeing the jurisdiction and reconstituting his scheme in Boston.  Thus, there should be no question that the two point enhancement for relocating a scheme to evade law enforcement pursuant to U.S.S.G. § 2B1.1(b)(9)(A) applies.  Nevertheless, defendant claims that this enhancement should not apply because the application note for U.S.S.G. § 2B1.6 states that it should not be applied in conjunction with "any enhancement for the transfer, possession or use of a means of identification." This is a non-sequitur.  Defendant's two point enhancement for relocating his mail fraud and identity fraud scheme is not an enhancement for the "transfer, possession or use of a means of identification."  Indeed, the application note, though it does not cite the specific section, is actually quoting the language from a specific enhancement, U.S.S.G. §

2B1.1(b)(10)(C). It has nothing to do with U.S.S.G. § 2B1.1(b)(9)(A).

      6.    <u>Possession of Device Making Equipment, 2 Point Enhancement</u>:

Defendant pled guilty to possession of device making equipment. Thus, there ought to be no question that two point enhancement for possession of device making equipment pursuant to U.S.S.G. § 2B1.1(10)(A)(i) applies. Nevertheless, defendant claims that this enhancement should not apply because the application note for U.S.S.G. § 2B1.6 states that it should not be applied in conjunction with "any enhancement for the transfer, possession or use of a means of identification." This is not correct. As noted above, the application note, though it does not cite the specific section, is actually quoting the language from a specific enhancement, U.S.S.G. § 2B1.1(b)(10)(C). It does not include the language at issue her from U.S.S.G. § 2B1.1(10)(A)(i).

The decision by the Sentencing Commission not to include U.S.S.G. § 2B1.1(10)(A)(i) in the exemption it created to avoid double counting in U.S.S.G. § 2B1.6 makes sense. Possession of device making equipment is a separate crime pursuant to 18 U.S.C. § 1029(a)(4) from the identity fraud statutes under 18 U.S.C. §§ 1028 and 1028A. Thus, it could not be considered double counting to include an enhancement for possession of device making equipment for a person convicted of both that and aggravated identity fraud.

      7.    <u>Commission of Offense While on Release, 3 Point Enhancement</u>:

Defendant pled guilty to committing the Boston portion of his offense while he was on release from his federal case in Atlanta. Thus, there is no dispute that the three point enhancement for commission of an offense while on release pursuant to U.S.S.G. § 2J1.7 applies.

      8.    <u>Obstruction of Justice, 2 Point Enhancement</u>:

Defendant pled guilty to obstruction of justice relating to the investigation of his Atlanta

conduct. Consequently, there is no dispute that the two point enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1 applies.

       9.      <u>Aggravated Identity Theft, Mandatory Two Years On and After</u>

Defendant pled guilty to aggravated identity theft in violation of 18 U.S.C. § 1028A. Pursuant to that statute, and to U.S.S.G. § 2B1.6, defendant's sentence must be two years imprisonment on and after the sentence he receives for his other counts of conviction.

      10.      <u>Role in the Offense, 3 Point Enhancement:</u>

Defendant was arrested first in Atlanta after a person who worked for him picked up packages at a Mail Boxes Etc. that defendant had leased in a false name. This person, a "runner" was paid by defendant to collect boxes on his behalf. Similarly, in Boston, defendant was arrested after two runners delivered fraudulently obtained packages to the defendant. Officers observed the defendant pay these individuals, and recovered in Sharapka's possession numerous false identifications with the photographs of these and other runners. Since by Sharapka's own admission at least one other person was involved in the scheme (the person in Russia who was providing the identity and credit card information), Sharapka's ought to receive a three level enhancement for his role as a manager or supervisor of criminal activity involving five or more participants (Sharapka, the person in Russia, the runner in Atlanta, and the two runners in Boston).

Sharapka's argument that he should receive a minimal or minor role adjustment is ridiculous. Sharpaka seems to believe that because others were involved in even more fraudulent conduct, of which his fraud was only a portion, he is only a minimal player. Sharapka ignores the fact that he is not charged with participation in that broader conspiracy, he is charged only

that fraud that he himself committed. Thus, he cannot be considered a minor or minimal participant.

Sharapka's supports his claim that he was a minor participant in the fraud by asserting that he made only $12,000 in profits from the scheme. This is a lie. At the time Sharapka was arrested in Boston, he had $14,000 in cash in his apartment. He also was wearing a fraudulently obtained Frank Mueller watch purchased for $11,000.[4] At that time, Sharapka, by his own admission, had no legitimate job, and no means of earning money other than his criminal enterprise. Thus, Sharapka had $25,000 worth of profits in his possession at the time of his Boston arrest. Moreover, he had another $88,000 worth of stolen merchandise in his Boston apartment. In other words, Sharapka had over $100,000 in fraudulently obtained cash and goods in his physical possession on the day of his arrest in Boston. For him to claim that his total profits for the months-long scheme in two states was only $12,000 is ridiculous.

    11.    <u>Acceptance of Responsibility, Possible 2 Point Reduction</u>

Defendant seeks a three level reduction for acceptance of responsibility in this case. There is no question that he is not entitled to the third point. This point is only available upon motion of the government, if the defendant provided notice of his intent to plead sufficiently in advance of the trial to allow the government to avoid preparing for trial. Defendant agreed to plead less than one week before trial, well after the government spent considerable resources preparing for trial in this matter. Consequently, no such motion will be filed.

---

[4] This watch was initially thought to be Sharapka's personal property, and was released, at Sharapka's direction, to a friend of his. Only after agents analyzed his computer did they discover that the watch had been fraudulently purchased as part of Sharapka's scheme. The watch, subject to a forfeiture provision in the Superseding Information, is still missing.

Indeed, defendant's eligibility for the remaining two points under U.S.S.G. § 3E1.1 is also in doubt.  As defendant's sentencing memorandum makes clear, he continues to minimize his role in the offense, and denies responsibility for the overwhelming majority of his conduct.  The mere fact that defendant entered a plea of guilty does not make him automatically eligible for a reduction for acceptance of responsibility.  Consequently, the Court should consider whether defendant ought to receive any credit for acceptance of responsibility.  See United States v. May, 359 F.3d 683, 694 (4th Cir. 2004) ("the probation officer correctly concluded that May did not accept responsibility because he minimized his role in the offense and attempted to explain away his behavior."); United States v. Kiel, 454 F.3d 819 (8th cir. 2006) (denying acceptance of responsibility adjustment where defendant pleaded guilty on last day of trial and "only admitted to videotaping two victims when it was apparent from the tapes that there were more than two victims."); United States v. Torres-Molina, 215 F.3d 1335 (9th Cir. 2000) (table) (finding no error where district court denied acceptance of responsibility where defendant denied involved in muliple related drug transaction after his plea to a single drug transaction); and United States v. Espinosa-Jimenez, 159 Fed. Appx. 680, 685 (6th Cir. 2005) (upholding district court's denial of acceptance points where the district court found that defendant denied being involved in related drug crimes for which he was culpable).

The government leaves to the Court's discretion after the hearing whether defendant's denial of the full scope of his criminal activity and continued minimization of his role in the offense makes him ineligible for any reduction for acceptance of responsibility.

C.  **Guideline Range:**

Based on the foregoing calculation, the defendant is an Offense Level 39, with a potential

two point reduction for acceptance of responsibility. Defendant is a criminal history category I. With the 24 month on and after sentence required by 18 U.S.C. § 1028A and U.S.S.G. § 2B1.6, defendant's guideline range is 234 to 286 months, or 286 to 351 months if the Court denies the defendant any points for acceptance of responsibility.

**D.      Deviation from the Guidelines is Inappropriate:**

In addition to arguing for a guideline range far below that which defendant's guilty plea requires, defendant seeks a downward departure or deviation below the otherwise applicable guideline range. Defendant claims several reasons why the guideline range is inappropriate. None is meritorious.

   1.      <u>Loss Does not Overstate the Defendant's Culpability</u>:

Defendant first claims that a downward departure is appropriate under U.S.S.G. § 5K2.0 "because the applicable loss calculation figure bears no resemblance to the actual pecuniary harm caused to the victim." This is not true. Although it is impossible to know exactly how much loss was caused by the defendant's fraudulent scheme, and thus it is necessary to apply the $500 multiplier to the hundreds of access devices held by the defendant to arrive at an estimate of the harm, this does not result in an overstatement of the actual loss.

Defendant was a significant player in identity fraud and credit card theft. Victims of identity theft suffer sudden drops in their credit score, making it more expensive or impossible for them to borrow money, and forcing them to spend hours attempting to prove that they did not charge the items fraudulently purchased in their name. It is far from a victimless crime. Yet, under the guidelines, none of the losses to the identity fraud victims are included in the loss calculation. Moreover, the victims whose losses are counted -- the banks that issued the credit

cards -- spend millions of dollars each year attempting to prevent the sort of crime at which the defendant was so proficient. The activities of the defendant and others involved in identity and credit card fraud costs these banks and their cardholders millions of dollars annually that cannot be attributed to individual defendants. Defendant cannot now hide behind the fact that his extensive fraud was so complicated that it is impossible to say with precision the exact amount of damage that he caused. This provides no basis for a downward departure or deviation.

Other courts have found that defendants ought to be held liable for very large losses created by their possession of multiple access devices. See, e.g., United States v. Mei, 315 F.3d 788, 791 (7th Cir. 2003) (multiplying average maximum credit limit by number of cards was appropriate because actual credit limit of some cards was unknown, resulting in loss of $1,918,172.27); United States v. Lin, 410 F.3d 1187, 1191 (10th Cir. 2005) (upholding loss finding of $200,000 based on aggregate credit limit of 34 access devices); and United States v. Sowels, 998 F.2d 249, 250 (5th Cir. 1993) (finding that combined loss from 110 stolen credit cards was $351,600), cert denied, 510 U.S. 1121 (1994).

    2.    <u>Defendant's Role Was Not Minimal</u>:

As noted above, defendant was not a minimal player in this fraud. Moreover, his claim to have only made $12,000 in profits is false. Defendant's action directly caused the seven figure losses with which he is attributed under the guidelines. Whatever his true profits were, defendant intentionally and knowingly participated in a scheme which he knew would cause over a million dollars of losses. He cannot be heard now to complain that his share of the profits was not great.

    3.    <u>Multiple Enhancements Are Justified</u>:

Defendant claims that the multiple enhancements under the guidelines are for "identical

conduct" resulting in an unfair cumulative effect. This is not true. Defendant's enhancements are appropriate given the wide ranging nature of his scheme; the fact that he relocated it after he was first arrested; and the fact that he obstructed justice by fleeing prosecution. The enhancements do not continually target "identical conduct." Instead, they are reflective of the fact that defendant's conduct was complex, far reaching, and contemptuous.

    4.    <u>Defendant Did Not Cooperate</u>:

Defendant claims that his immediate confessions and proffer sessions entitle him to consideration for a downward departure on the grounds that he cooperated with law enforcement. Defendant seems to confuse offers to cooperate with actual cooperation. This is particularly ironic given that defendant's cooperation in Atlanta lasted only long enough to result in his being released from pretrial detention so that he could flee the jurisdiction and continue his criminal activity. Defendant's cooperation did not result in the prosecution of a single other individual, and did not advance the investigation of his crimes. In short, defendant did not cooperate -- he pretended to cooperate.

    5.    <u>History and Character of the Defendant</u>:

Defendant goes into great detail in his submission describing his excellent academic credentials, the opportunities he was afforded as a result of his hard work and intelligence, and describes his criminal conduct as "totally out of character." The government has no doubt that the defendant is very intelligent and was afforded wonderful opportunities to study and advance his education and career. Given those opportunities, it is hard to believe that defendant's conduct is "totally out of character." Defendant had the ability to make money in perfectly legal ways. Nevertheless, he repeatedly, over a long period of time, choose instead to use his considerable

talents to make money by fraud. He did not end this fraud scheme when he was initially caught. Instead he fled, assumed someone else's identity, moved to Boston, and reconstituted the scheme. These are hardly the actions of a person for whom criminal conduct is "totally out of character." Defendant had plenty of opportunities to chose to make a living through legal means. He choose instead to devote his considerable talents and intelligence to fraud. For these reasons, no downward departure or deviation is appropriate.

**E.     Conclusion**

The United States asks this Court to sentence the defendant to a 234 month period of incarceration, as well as a fine within the guideline range, a five year period of supervised release, a $100 special assessment, and restitution in the amount of $446,865.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:   /s/ Seth P. Berman
      SETH P. BERMAN
      Assistant U.S. Attorney

Dated: October 19, 2006